1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KAZEROUNI LAW GROUP, APC
6069 South Fort Apache Road, Suite 100
Las Vegas, Nevada 89148

# EXHIBIT 7

```
1              UNITED STATES DISTRICT COURT
                   DISTRICT OF NEVADA
2

3    Lee C. Kamimura,

4    individually and all

5    other similarly situated,

6              Plaintiff,

7

8    vs.                        Case No:  2:16-cv-00783-

9                               APG-CWH

10   Green Tree Services,

              Defendant.

11   _____

12

13        VIDEO DEPOSITION OF JOHN ULZHEIMER

                   February 8, 2018

14                 1:19 p.m. EST

15                Veritext Atlanta

16             1075 Peachtree Street

17                Atlanta, Georgia

18

19

20   Reported By:

21   Valerie N. Almand,

22   RPR, CRR, CRC

23   Job No. 2808282

24

25   Pages 1 - 128
```

Page 1

```
 1                  INDEX OF EXAMINATION
 2    By Mr. Kind                             Page 4
 3
 4
 5
 6                  INDEX OF EXHIBITS
 7    PLAINTIFF'S
 8    EXHIBIT            DESCRIPTION              PAGE
 9      Exhibit 1    Plaintiff's Third Amended      4
10                   Notice of Taking Deposition of
11                   Defendant's Designated Expert
12                   John Ulzheimer
13      Exhibit 2    TransUnion credit report (with 4
14                   redactions)
15      Exhibit 3    Expert Report of John          4
16                   Ulhzheimer in instant case
17      Exhibit 4    excerpt from Green Tree manual 4
18                   re Legal Requirements, State &
19                   Federal Law - Fair Credit
20                   Reporting Act
21                   (GreenTree/Kamimura 000889-92)
22
23
24
25
                                             Page  2
```

```
 1    APPEARANCES OF COUNSEL:

 2

 3    On behalf of the Plaintiff (telephonically and via

 4    teleconferencing):

 5              MICHAEL KIND, Esquire

 6              Kazerouni Law Group, APC

 7              6069 S. Fort Apache Road

 8              Suite 100

 9              Las Vegas, Nevada  89148

10              800.400.6808

11

12    On behalf of the Defendants (telephonically and

13    via teleconferencing):

14              MARY KATE KAMKA, Esquire

15              DONALD H. CRAM, Esquire

16              Severson & Werson

17              One Embarcadero Center

18              Suite 2600

19              San Francisco, California  94111

20              415.677.5695

21

22    Legal Video Specialist:  Taylor Graves

23

24

25
```

1          (Plaintiff's Exhibit 1, Plaintiff's

2     Exhibit 2, Plaintiff's Exhibit 3 and Plaintiff's

3     Exhibit 4 marked)

4          THE VIDEOGRAPHER:  We're now on the

5     record.  The time is 1:19 p.m.  This will be the

6     video deposition of Mr. John Ulzheimer.  If

7     counsel present on the phone would introduce

8     themselves for the record and who they represent,

9     please.

10         MR. KIND:  This is Michael Kind on behalf

11    of the plaintiff.

12         MS. KAMKA:  This is Mary Kate Kamka and

13    Don Cram on behalf of defendant Ditech Financial.

14         THE VIDEOGRAPHER:  Thank you, Counsel.

15         And if Ms. Valerie Almand, our court

16    reporter, would swear the witness today, we'll

17    proceed.

18              JOHN ULZHEIMER,

19    having been duly sworn, was examined and testified

20    as follows:

21              EXAMINATION

22    BY MR. KIND:

23      Q.  Good morning.  Can you hear me well?

24      A.  I can hear you fine.  There's a little

25    bit of a delay, but otherwise I can hear you fine.

Page  4

1     Q.  So, yes, I agree, there's a bit of a

2  delay.  So in that case I'm going to try to do my

3  best to let you finish so I'm sure that you're

4  done, I'll ask the question, and I hope that you

5  do the same.  Is that all right?

6     A.  Sure, that's fine, thank you.

7     Q.  Is there any reason why you would not be

8  able to give your best testimony today?

9     A.  No, sir.

10     Q.  If you don't understand any of my

11  questions, I'd ask that you let me know and I'll

12  do my best to rephrase it.  Is that fair?

13     A.  It is, yes.

14     Q.  Also, I know that you've given your

15  deposition a bunch of times and I've read through

16  some of the transcripts, so I'm not -- how many

17  times, approximately, have you had a deposition

18  taken?

19     A.  I would say in the neighborhood of 50 to

20  60 times, give or take.

21     Q.  Also, I think that your report lays out

22  your experience and, of course, your record, so we

23  won't necessarily go through a lot of your

24  background.  But for this particular case, could

25  you tell me when you were first retained as an

Page 5

1    expert.

2         A.   Sure.  I believe it was sometime either

3    in October or perhaps even early November, around

4    that timeframe, of last year.

5         Q.   And then your report is from -- was much

6    more recent, right?

7         A.   Looks like November 13th of last year.

8         Q.   Oh, okay.  So you submitted your report

9    shortly after you were retained?

10        A.   That's correct, yes.

11        Q.   Did you receive an initial retainer in

12   this case?

13        A.   Yes, sir, I did.

14        Q.   How much was that?

15        A.   $7500.

16        Q.   What was your understanding of the

17   assignment when you first were retained?

18        A.   My understanding of the scope of work was

19   to review the materials provided to me by counsel,

20   including the credit report information and the

21   expert report of Mr. Evan Hendricks, and offer any

22   opinions that I saw fit either in rebuttal or that

23   I felt that the facts supported.

24        Q.   And then besides the documents listed in

25   your report, and you have it -- you know, we won't

Page 6

1    pull it out for right now.  But other than the
2    documents listed in the report are there any other
3    documents that you were provided in connection
4    with this case?
5        A.  Subsequent to the submission of my report
6    I obviously received a couple of notices of
7    deposition.  But other than that, that's the
8    totality of the documents that I received.
9        Q.  Okay.  You know what, let's mark -- well,
10   you should have there Exhibit Number 1, which is
11   the most recent notice of this deposition.
12       A.  Okay.
13       Q.  Do you have it there?
14       A.  Yes, sir, I do.
15       Q.  Okay.  When did you receive that
16   document?
17       A.  I got this I think a couple of days ago.
18   It would have been two days ago last night.
19       Q.  And when you were originally provided
20   documents were they given by the attorneys in this
21   case?
22       A.  Yes, sir, they were.
23       Q.  Were they sent by email?
24       A.  I don't recall how I received them, but
25   they were sent electronically in some way.

Page 7

1    Q.  Either today or this morning or yesterday

2  were you asked to search for emails between you

3  and your attorneys?

4    A.  No.  That was part of the deposition

5  document request, so I did it in response to the

6  request, not because anybody asked me to do it.

7    Q.  Okay.  So did you look to see if there

8  was emails with documents that were sent by email?

9    A.  There were not any documents attached to

10  any emails that I had received that I was able to

11  locate.

12    Q.  If you had to guess how it was sent -- I

13  get that you don't remember -- was it Dropbox link

14  or something like that?

15    A.  Yeah.  Normally because of the size and

16  the volume of documents in these types of cases I

17  almost always ask that if it's possible to set up

18  some sort of FTP or Dropbox type of deal, just so

19  we're not sending massive files back and forth

20  that may not actually find their intended

21  recipient.

22    Q.  And when you were originally retained do

23  you remember if it was a phone call or an email?

24    A.  I do not recall if it was a phone call or

25  an email.

Page 8

```
 1         Q.   Okay.  How many times have you testified
 2    on behalf of Ditech or Green Tree?
 3         A.   I believe this is either my second or
 4    possibly third.
 5         Q.   And how many times have you been retained
 6    by the attorneys on behalf of Ditech in this case?
 7         A.   I would say I think -- well, this is the
 8    first time that Mr. Cram and I have worked
 9    together, so that would be number one for he and
10    I.  Mary Kate and I, I think this is possibly the
11    second time that we've worked together.
12         Q.   Have you worked with other attorneys at
13    their firm?
14         A.   I have, yes.
15         Q.   Approximately how many times?
16         A.   I would say about a dozen or so times
17    over the years.
18         Q.   Okay.  Now, obviously -- well, let me ask
19    you:  You identify as a credit expert, right?
20         A.   That's correct.
21         Q.   Would you say you're also a credit score
22    expert?
23         A.   Yes, I would.
24         Q.   A credit reporting expert?
25         A.   Yes.
```

Page 9

1      Q.   Are you -- do you consider yourself being

2  an expert on privacy issues?

3      A.   Not -- not to the extent where I would

4  hold myself out to be an expert witness level of

5  expert on that topic.

6      Q.   But what's the qualification, that you

7  know enough about privacy as it relates to credit

8  reporting?

9           MS. KAMKA:   I would just -- sorry --

10  object to form and the vague nature of the word

11  privacy being used.

12           Go ahead, John, you can continue.

13      A.   Yeah, I use the court's definition or

14  what they consider to be kind of the

15  qualifications as an expert.   And I don't hold

16  myself as a privacy expert.   My expertise is very

17  specific to credit reporting and credit scoring

18  and the issues surrounding consumer credit.

19  BY MR. KIND:

20      Q.   How about bankruptcy?   Are you a

21  bankruptcy expert?

22           MS. KAMKA:   Again, I just object to form.

23      A.   I would say I probably know more about

24  bankruptcy than the layman.   I certainly don't

25  know as much about bankruptcy as, say, for

Page 10

1  example, a bankruptcy attorney.  But, you know, I

2  don't hold myself as a bankruptcy expert witness,

3  per se.

4  BY MR. KIND:

5      Q.  What do you mean, per se?

6      A.  Meaning that I don't own any websites

7  where I am advertising myself as a bankruptcy

8  expert witness or I don't -- I don't know that

9  I've ever been retained in my time being an expert

10  specifically on the issues surrounding the nature

11  of the filing of a certain type of a bankruptcy,

12  for example.  Certainly the impact of a bankruptcy

13  on credit, yes.  But that's kind of the extent of

14  it.

15      Q.  Okay.  And when you say the effect of a

16  bankruptcy on credit, could you talk more about

17  that.

18          MS. KAMKA:  Mike, I don't mean to

19  interrupt.  I'm going to make an objection here

20  that hopefully will limit my objections in the

21  future.

22          When we use the term bankruptcy in this

23  deposition I'd ask that you clarify if you're

24  talking about a particular type of bankruptcy or

25  just bankruptcy in general.

Page 11

1        You can answer, John.

2        THE WITNESS:  Okay.

3    A.   Bankruptcy as far as the impact on a

4    credit report, how it gets to a consumer's credit

5    report, how long it remains on a consumer's credit

6    report, how debts are reported if they are subject

7    to a bankruptcy, the impact of bankruptcy on a

8    consumer's credit score, the amount of time and

9    the extent that it impacts a consumer's credit

10   score, and generally what a lender believes or

11   what a lender feels when they see a consumer who

12   has a bankruptcy on his or her credit report.

13   BY MR. KIND:

14   Q.   As far as the effect of bankruptcy

15   legally on a debt, you would not hold yourself to

16   be an expert on that issue, correct?

17   A.   I don't know.  I think -- I'm not sure I

18   would go that far.  I mean, I certainly understand

19   how a bankruptcy affects the collectability of a

20   debt or protection from the creditor when the

21   consumer does file bankruptcy and includes a debt

22   in bankruptcy.

23   Q.   Yeah, but the question is would you

24   consider yourself an expert on that issue.  I

25   understand you're talking generally.  But an

Veritext Legal Solutions
866 299-5127

1  expert, as you know, you know, gets into the

2  nuances, knows all the specifics, et cetera.

3        A.  Yeah, no, I --

4        Q.  So the --

5        A.  Go ahead.  I wouldn't hold myself out as

6  being an expert on all of the nuances of consumer

7  bankruptcies.

8        Q.  Okay.  So you should have there Exhibit

9  Number 2 premarked, and that would be the Exhibit

10 14 from Hardwick's deposition.  Let me know if you

11 have that.

12       A.  I do have it.  Yes, sir, I've got it.

13       Q.  Okay.

14           MS. KAMKA:  Sorry, Michael, did you say

15 Exhibit 12 from Hardwick's deposition?

16           MR. KIND:  14.

17           MS. KAMKA:  14, okay, thanks.

18 BY MR. KIND:

19       Q.  All right.  So have you seen this

20 document before?

21       A.  Yes, sir.

22       Q.  All right.  And --

23       A.  Well, actually, just in the spirit of

24 hyper-accuracy, I've seen this document but I

25 haven't seen it with all of these redactions.

Page 13

1    I've seen it without the redactions.

2         Q.   Fair enough.  So this is Mr. Kamimura's

3    TransUnion credit report from April 2015, right?

4         A.   Yes, sir, it is.

5         Q.   All right.  So we're going to go to page

6    6 of 7.

7         A.   Okay, I've got it.

8         Q.   All right.  So over there you have a list

9    of credit inquiries.  Can you talk a little bit

10   about what these inquiries are.

11        A.   So an inquiry in general is a record of

12   access into a consumer's credit report by some

13   party, and kind of trickling down from there there

14   are a variety of different types of inquiries.

15        Q.   Okay.  Now, you said that this is an

16   inquiry into credit report.  What do you mean by

17   credit report?

18        A.   A credit report meaning the report

19   compiled by any of the three generally recognized

20   national consumer credit reporting agencies:

21   Equifax, Experian, and TransUnion.  So the inquiry

22   is a record of access into someone's credit

23   report.

24        Q.   Would any -- is there a way that someone

25   could access just a credit score and not credit

Page 14

1    report?

2         A.   Yes.

3         Q.   Would that show up on the inquiries?

4         A.   It would, yes.

5         Q.   Okay.  And how would you know whether it

6    was the credit score or credit report?

7         A.   By looking at the credit report you

8    wouldn't have any idea.  You would just know that

9    that's -- on some date some party accessed the

10   consumer's credit report.  Whether they took

11   possession of just the report or the entire credit

12   report is not listed on this credit report in the

13   inquiries section.

14        Q.   Would that be for promotional inquiries

15   and also account review?

16        A.   Yes.  It would be for all types of

17   inquiries.  There's no context as far as what the

18   deliverable was when you're looking at someone's

19   credit report like what we have here in Exhibit 2.

20        Q.   Based on the documents that you reviewed,

21   the inquiries listed here on this exhibit, are

22   these consumer reports?

23             MS. KAMKA:  Object to form.

24        A.   Exhibit 2 is formally referred to as a

25   consumer disclosure.

Veritext Legal Solutions
866 299-5127

1   BY MR. KIND:

2       Q.   What I'm referring to is the inquiries on

3   page 6.  Are those inquiries off consumer reports?

4       A.   Yes, they're inquiries into this

5   particular consumer's TransUnion consumer reports

6   as housed by TransUnion, that's right.

7       Q.   Okay.  Also -- and you've read through

8   Mr. Hardwick's deposition transcript, right?

9       A.   Yes, I did -- I read through it as part

10  of my crafting of my report back in November,

11  that's right.

12      Q.   So in his deposition -- and correct me if

13  I'm wrong, I'll just represent how I remember

14  it -- he explained that under the promotional

15  inquiries, those were actually also account review

16  inquiries, and he wasn't sure why they showed up

17  as promotional inquiries.  Do you remember seeing

18  that?

19      A.   I don't recall that specificity, just

20  simply because it's been several months since I

21  read it.

22      Q.   Okay, fair enough.  Do you know -- have

23  you seen before that a user might pull a consumer

24  report for account review purposes, but it shows

25  up on a consumer disclosure as a promotional

Page 16

1    inquiry?

2         A.   No, they're two very different things.

3    So I've never seen an example of where one is

4    being mislabeled as being promotional or account

5    review like that.

6         Q.   Well, if my representation of

7    Mr. Hardwick's testimony is correct, do you have

8    any reason to believe that that's not what

9    happened in this particular case?

10             MS. KAMKA:   I object that it calls for

11   speculation.

12        A.   Yeah, I would be -- I don't know -- I

13   don't know Mr. Hardwick.   I would suggest that I

14   don't know that he's -- I mean, it seems like

15   TransUnion would be the best party to answer that

16   question as to what type of access into their

17   database occurred on those dates and why they're

18   choosing to display those as promotional versus

19   account review if they really were, in fact,

20   account review.

21        Q.   Okay.   But you've never seen this before

22   where it's listed as one but the user is saying

23   that it was another?

24        A.   No, I've never heard of somebody

25   suggesting that the disclosure is misrepresenting

                                          Page 17

1    the type of the inquiry.

2         Q.  Okay.  Could you tell me what a

3    subscriber agreement is?

4         A.  Can you repeat that?  I'm sorry.

5         Q.  Sure.  Could you tell me what a

6    subscriber agreement is?

7         A.  Well, in my world a subscriber agreement

8    indicates the agreement between a user of credit

9    reports and the credit reporting agency.

10        Q.  Have you ever come across a case where a

11   user and the credit reporting agency do not have a

12   subscriber agreement?

13        A.  That's not usually the nature of my

14   expert work, but I know when I was in Equifax

15   nobody ever got access into our database unless

16   they had a subscriber agreement.

17        Q.  Did you review Ditech's subscriber

18   agreement with TransUnion?

19        A.  I don't believe I was provided with that

20   document, so no, I wouldn't have reviewed it.

21        Q.  Have you seen other subscriber

22   agreements?

23        A.  I have, yes.  Not in this case, but yes,

24   I've seen subscriber agreements in my time, yes.

25        Q.  Would you agree with me that subscriber

Veritext Legal Solutions
866 299-5127

```
 1    agreements all have in their warning about
 2    permissible purpose in the FCRA?
 3              MS. KAMKA:  I'll just object to form and
 4    the inclusion of all subscriber agreement.
 5        A.   The subscriber agreements that I've seen
 6    did have language regarding permissible purpose
 7    and the Fair Credit Reporting Act.
 8    BY MR. KIND:
 9        Q.   Did you ever see in this case any
10    spreadsheets relating to the size of the potential
11    class in this case?
12        A.   Did you say the size of the potential
13    class?
14        Q.   Yes.
15        A.   No, sir, I haven't seen anything like
16    that.
17              MS. KAMKA:  I'll just object that that's
18    outside the scope of the examination today.
19              But go ahead, you can answer.
20        A.   No, sir, I haven't seen anything like
21    that.
22    BY MR. KIND:
23        Q.   Did you review or discuss the potential
24    size of the potential class in this case with
25    anybody?
```

Veritext Legal Solutions
866 299-5127

```
1              MS. KAMKA:  Same objection.
2         A.  No, sir, I have not.
3    BY MR. KIND:
4         Q.  Did you review any documents that relate
5    to how many people -- how many customers of Ditech
6    had a bankruptcy?
7         A.  No, sir, I don't believe I saw anything
8    like that.
9         Q.  Did you review any consumer reports that
10   Ditech received from TransUnion from an account
11   review inquiry?
12             MS. KAMKA:  Object to form.  I assume
13   you're asking only about plaintiffs.  Correct me
14   if I'm wrong.
15        A.  Yeah, I don't --
16   BY MR. KIND:
17        Q.  I'm asking --
18        A.  Sorry.  I'm sorry, go ahead.
19        Q.  Yeah, so it's the same question.  Have
20   you seen any consumer reports that Ditech received
21   from TransUnion in response to an account review
22   inquiry?
23        A.  No, sir.  The only report that I have is
24   this one Exhibit 2.
25        Q.  Have you ever seen an account review
```

Page 20

1    inquiry consumer report?

2         A.  Yes, sir, many times.

3              MS. KAMKA:  Object to form.

4         A.  Yes, many times.

5    BY MR. KIND:

6         Q.  Have you ever seen one from -- received

7    by Ditech?

8         A.  I don't believe that I have.

9         Q.  Have you seen ones that were sent by

10   TransUnion?

11        A.  I believe I have in other cases.

12        Q.  And did those more than -- information

13   about more than one consumer?

14        A.  Say that again, please.

15             MS. KAMKA:  Object to form.  Vague and

16   ambiguous.

17        A.  I'm sorry, do you mind repeating --

18   BY MR. KIND:

19        Q.  Yeah.  Did those consumer reports that

20   were sent in response to an account review inquiry

21   ever include just one consumer?

22        A.  Well, just for clarity, they all would

23   have been for one consumer, because most of my

24   work there is only one plaintiff.  And so the

25   document production would only be for that one

                                          Page 21

1   particular consumer.  But that would be the only
2   reason why it would only be for one consumer.
3        Q.  Did it appear from the documents that
4   you're referring to that there were more -- let me
5   start this question again.
6        A.  Okay.
7        Q.  My question is:  Account review inquiries
8   generally are batched inquiries, would you agree
9   with that?
10       A.  That's correct, yes.
11       Q.  Okay.  So when you say you only saw from
12  one consumer, maybe the rest of it was redacted
13  out or just not given to you?
14            MS. KAMKA:  Object on the grounds it
15  calls for speculation.
16            Go ahead, John.
17       A.  Yeah, I don't recall why it would have --
18  I don't recall the exact scenarios in the other
19  cases.  But, again, if you have Joe Smith as a
20  plaintiff you're not going to see Joe Smith and a
21  million other consumers' information in the
22  document production.
23  BY MR. KIND:
24       Q.  Okay.  But the account review inquiry
25  consumer reports generally have a lot of consumers

Page 22

1    on one report.

2         A.   So I think -- when you're saying a

3    report, a report is for one consumer, always.  You

4    may be referring to the deliverable in the batch

5    where the deliverable could be millions of

6    consumers.  Just make sure we're using the same

7    terminology.

8              When you say report, that's a report,

9    Exhibit 2, versus the batch deliverable which

10   could be 10 million consumers' reports.  So just

11   make sure we're using the same terminology.

12        Q.   I appreciate that clarification.  So,

13   using that terminology, account review inquiries

14   are generally requested in batches of multiple

15   consumers' reports, and then the credit reporting

16   agency responds with multiple consumers' reports;

17   is that correct?

18        A.   Yes, sir, that's correct.

19        Q.   Okay.  Have you ever had your testimony

20   excluded by any court?

21        A.   Yes.  I know there have been scenarios

22   where it was limited or I couldn't talk about

23   certain things, so it was almost, I guess, limited

24   to certain things.

25              And there was a lawsuit in, I want to say

Page 23

1    it was West Virginia, where I wasn't allowed to

2    talk about credit repair, if I remember correctly.

3    But those are the only two that I can think of.

4         Q.  Do you remember those case names?

5         A.  The West Virginia case was Dougherty

6    versus Ocwen, and I don't recall the name of the

7    other one.

8         Q.  But the other one was related to the

9    credit repair?

10        A.  No.  The Dougherty case was related to

11   credit repair.

12        Q.  And what was the other one related to, if

13   you remember?

14        A.  I don't remember.  It's been many years,

15   and most of these aren't terribly memorable.

16        Q.  In preparing your expert report -- and we

17   could take it out.  So it's document -- it should

18   be Exhibit Number 3.

19        A.  Okay.  I've got it.

20        Q.  And it's marked as Exhibit Number 3?

21        A.  It is, yes, sir.

22        Q.  Okay.  So in preparing that report, did

23   you receive any assistance from anybody?

24        A.  I did not.

25        Q.  Did you receive any advice from anyone?

Veritext Legal Solutions
866 299-5127

1        A.   No, sir, I did not.

2        Q.   Was there any information that you

3    received that you did not use in preparing this

4    report?

5        A.   Probably.  Give me a minute.

6        Q.   I mean, the deposition transcripts for

7    the purposes of my work weren't terribly useful,

8    and so even -- the plaintiff's deed of trust, even

9    though it's nice to have it, the home equity

10   agreement and disclosure statements, again, nice

11   to have it, but it's not -- it wasn't -- it didn't

12   kind of go into the crafting of the report, other

13   than the documents reviewed section.

14       Q.   Were there any opinions that you

15   considered but did not end up including in your

16   report?

17       A.   No.  No.  Generally if I've got an

18   opinion I'll sink it in the report somewhere or

19   somewhere.

20       Q.   Did anyone ask you to form an opinion in

21   this case that you didn't add into the report?

22       A.   No.

23       Q.   What do you think is the biggest weakness

24   of your opinions in your report?

25       A.   Pardon?  The biggest what?

Veritext Legal Solutions
866 299-5127

1       Q.   What do you think are the strongest

2   weaknesses of your opinions in your report?

3            MS. KAMKA:   I object to form, vague and

4   ambiguous.

5       A.   I don't know.   I mean, clearly, you know,

6   I think with all of these you have two experts who

7   have opinions that are in direct contrast with

8   each other.   So I guess at the end of the day

9   someone gets to decide which one they are going to

10  give more validity to.

11           So that's probably, you know, in my work,

12  anyways, that's usually the biggest challenge is

13  kind of the battle of the expert opinions, if you

14  will.

15      Q.   Did you draft the report yourself?

16      A.   I wrote the entire thing myself, that's

17  right.

18      Q.   Okay.   So let's dive into the opinions,

19  and we'll go straight to page number, let's see in

20  there -- page 12.

21      A.   Okay.

22           MS. KAMKA:   Sorry, Michael, did you say

23  page 12?

24           MR. KIND:   Yeah, that's right.

25           THE WITNESS:   Uh-oh.   I just moved the

                                            Page 26

1    mouse.  Did I screw something up?

2              MS. KAMKA:  Hold on.

3              THE WITNESS:  Hold on one second.  I just

4    moved the mouse and it blanked out the screen.

5    Never mind.  All right, thank you.  Sorry about

6    that.

7              Okay, sorry about that.

8              MR. KIND:  You're good?

9              THE WITNESS:  Yeah, user error on my

10   part.

11   BY MR. KIND:

12       Q.  Okay.  Actually, I'd like to go back to

13   page 3, quick question on page 3.

14       A.  All right.

15       Q.  The first paragraph on page 3 talks about

16   presentations.  Are those slide shows or some

17   other form of presentation?

18       A.  When I was doing them at Equifax and FICO

19   they would have had some sort of visual

20   accompanying the presentation.  They almost always

21   did either a visual or some form of a handout, if

22   you will.

23              I hate that, and so the presentations

24   that I've done subsequent to working in the

25   corporate world, I don't use any sort of

                                        Page 27

1    PowerPoint or any sort of slides.  I just get up
2    there and talk.
3         Q.  Do you happen to have any of the
4    presentations -- well, let me start that again.
5         In drafting this report did you rely on
6    any presentation visuals that you used back at
7    Equifax?
8         A.  No.
9         Q.  Okay.  And then on -- we talked about it
10   a little before.  Could you just explain the
11   difference between a soft inquiry and a hard
12   inquiry?
13        A.  Sure.  Sure.  So generally speaking, a
14   hard inquiry is the result of the consumer overtly
15   applying for something.  So like, for example, if
16   I go to a bank this afternoon and I apply for a
17   car loan, the type of inquiry that's going to end
18   up on my credit report is going to be a hard
19   inquiry.
20        A soft inquiry is generally the result
21   of -- or is generally not the result of a consumer
22   applying for something, meaning that either it's
23   the result of a lender or an insurance company
24   making a firm offer of credit and/or buying a
25   list, a preapproved list from one of the credit

Page 28

1    bureaus, or they're doing periodic account review

2    or account management runs, and those show up on a

3    credit report as being a soft inquiry.

4            And the -- I guess the practical

5    difference between the two is, as I put in my

6    report, the hard inquiry is fair game to credit

7    scoring systems and lenders, meaning that they can

8    see those if they pull someone's report, versus

9    soft inquiries which are only visible on consumer

10   disclosure reports, which are what we -- what

11   Exhibit 2 is an example of, and those do not have

12   any influence on credit scores and lenders do not

13   see them.

14       Q.   What is an account review inquiry?

15       A.   Well, not to be smart, but it's the

16   inquiry that's the result of a user doing an

17   account management or account review run with one

18   of the credit reporting agencies.

19       Q.   And you mentioned that a user might buy a

20   list from a credit reporting agency.  Is that what

21   is referred to as a promotional inquiry?

22       A.   Yeah, it's either promotional or

23   prescreened.

24       Q.   Okay.  Do other companies buy information

25   from users of information?

Page 29

```
 1              MS. KAMKA:  I object, lack of foundation.
 2              You can answer if you know.
 3         A.   Let me think about that for a second.
 4    So, again, just to make sure we're using the same
 5    terminology, a user is generally going to be a
 6    financial services company or a collection agency.
 7    Is that how you're defining user?
 8    BY MR. KIND:
 9         Q.   Yeah, I'll go along with how you define
10    it, so I'll agree with that.
11              And then the question is:  After a user
12    obtains information from a credit reporting
13    agency, will they often resell it to a third
14    party?
15              MS. KAMKA:  Same objection, lack of
16    foundation.
17         A.   Not that I'm aware of.  That's generally
18    frowned upon unless it's one company and the same.
19    But generally, no.
20    BY MR. KIND:
21         Q.   So one company and the same.  So it might
22    be a parent company or related company?
23         A.   Sure, sure.  But, you know, if I buy
24    10,000 credit reports and I'm John's bank, I can't
25    just go to you and say, Hey, you know, Michael's
```

Page 30

1    bank, do you want to buy these credit reports from
2    me?  That is not -- that doesn't happen.
3           Q.  And how do you know that?
4           A.  It's -- well, first off, it's called dual
5    use, and the credit reporting agencies don't allow
6    for dual use, because one of the two parties won't
7    be able to post an inquiry because the credit
8    bureau doesn't know of that subsequent reselling
9    of the report.  And you can make an argument --
10   and I haven't fully contemplated this -- but you
11   can make an argument that the second party didn't
12   have permissible purpose.
13          MS. KAMKA:  John, you probably know this,
14   and Michael probably would agree, but if you need
15   a break or anything, just let us know.
16          THE WITNESS:  Okay.
17          MR. KIND:  Yeah, absolutely.  Just let me
18   ask you this anytime.
19          THE WITNESS:  Okay.
20          MR. KIND:  And you too, Mary Kate, or the
21   court reporter as well.  Okay.
22   BY MR. KIND:
23          Q.  So going back to what we just discussed,
24   account review inquiries, how do you define an
25   account?

Page 31

```
1        A.   An account would be kind of the umbrella
2   of information regarding the consumer and their
3   relationship -- in other words, kind of
4   identifying attributes of the consumer with a
5   lender, for example, and that may include the
6   name, address, social, date of birth of the
7   consumer, any current or former lender liability
8   types of relationships that they may have had, and
9   then attributes of that relationship.
10       Q.   Are there always terms to an account?
11            MS. KAMKA:  Object to form, just vague
12   and ambiguous.
13       A.   I believe that pretty much when you apply
14   for an account with a financial service company,
15   you're asked to agree or you're asked to sign a
16   user agreement or a promissory note or a
17   cardholder agreement or click on a box if you're
18   doing it on line where you read and agree to their
19   terms of use, or terms and policies.
20       Q.   Okay.  So when you're defining an
21   account, what you call the attributes, so you're
22   referring -- let me start that again.
23            I understand in your report you make the
24   distinction between account and debts.  My
25   question to you is:  Other than those attributes
```

Page 32

```
1    that you described, name, social, and other
2    similar information, do you believe there's
3    anything else necessarily -- necessary to have an
4    account?
5         A.   Sure.  Well, the only reason you have an
6    account is because you had at one time some sort
7    of lender liability relationship.  So you may have
8    had a credit card at one point with Discover, or
9    you may have had a car loan at one point with
10   Wells Fargo, or, you know, you can think of a
11   bunch of other examples of lender liability
12   relationships.
13        Q.   And you agree with -- would you agree
14   with me that there would be different statuses to
15   an account, correct?
16             MS. KAMKA:   I object as vague and
17   ambiguous.
18        A.   Yes, certainly accounts are going to have
19   varying statuses, depending on the point in time
20   of the account, yes.
21   BY MR. KIND:
22        Q.   So I'm going to give you a few phrases or
23   terms, and I want to see what your
24   understanding -- your expert understanding of
25   those terms mean.  So how would you define an
```

Page 33

1  existing account?

2      A.  I don't know that I've ever used that

3  term.  I mean, an account is an account.  They're

4  all existing.  If there is no account then there

5  would be a nonexistent account.

6      Q.  And does the industry ever use the phrase

7  or the term existing account?

8      A.  What industry?

9      Q.  Your industry, the credit industry.

10     A.  I've never heard -- I've never heard

11 someone talk about an existing versus a

12 nonexisting account, except maybe in discussions

13 about fraud, did you open this account or not type

14 of scenario.

15     Q.  Well, I don't want to be argumentative,

16 and I just have -- I'll ask you the question.  In

17 Mr. Hendricks' report he refers to the term

18 existing account.  He also cites the Metro 2 that

19 uses the term existing account.

20         Did you notice that or do you remember

21 that from Mr. Hendricks' report?

22     A.  Not necessarily.

23     Q.  Okay.  Do you remember looking into or

24 reviewing the Metro 2 to see that phrase or term,

25 existing account?

Page 34

1        A.   I don't know that I reviewed the Metro 2

2   manual in the preparation of my report, because it

3   was not -- it was not substantive or it didn't

4   have a -- it wasn't influential or wouldn't have

5   been influential on my opinions.

6        Q.   All right.   How would you define a closed

7   account?

8        A.   A closed account would be an account that

9   is no longer active and can no longer be utilized

10  by the borrower.

11       Q.   But it would still be an existing

12  account?

13       A.   Sure, because the account still exists,

14  yes.   It's just an inactive or closed account.

15       Q.   And because your definition of account is

16  data on a -- somewhere, either in a file or on a

17  computer system?

18            MS. KAMKA:   I'll just object that it

19  misstates testimony.

20       A.   Yeah, not necessarily.   I mean, again, an

21  account is the record of the relationship between

22  two parties which would include attributes about

23  the relationship, attributes about the consumer

24  and attributes about the consumer's either active

25  or inactive liability.

Veritext Legal Solutions
866 299-5127

1      Q.  So how do you define an active account
2  versus an inactive account?
3      A.  Well, certainly you could define an
4  inactive account as an account that has not had
5  any activity on it for some period of time, and
6  that's obviously going to vary by -- vary by
7  lender, what they consider to be active versus
8  inactive.
9         Certainly you could look at a credit card
10  that has charges being made every single month and
11  payments being made every single month and is
12  still capable of being used as being an active and
13  open account.  So I think there's a bunch of
14  different scenarios that would fit both of those,
15  the active versus inactive scenario.
16      Q.  Does -- as far as you know, does the
17  credit reporting or the credit industry have a
18  particular definition to the use of the word
19  account?
20      A.  Not that I'm aware of.
21      Q.  Do you know what it means when the term
22  housed, H-O-U-S-E-D, a housed account, have you
23  ever heard of such a phrase?
24      A.  Did you say H-O-U-S-E-D?
25      Q.  Yeah, an account that is housed on a

Page 36

1   system.  Have you ever heard of that sort of

2   phrase?

3        A.  I don't think so.

4        Q.  Okay.  All right.

5            So we discussed the different statuses of

6   an account.  Is it your opinion that so long as an

7   account exists a user can do an account review

8   inquiry?

9        A.  Yes, sir, that's correct.

10        Q.  And that's regardless of whether the

11   account is open or closed?

12        A.  That's right.

13        Q.  And that doesn't matter if the account is

14   active or inactive?

15        A.  Correct.

16        Q.  And it doesn't matter if the account is

17   existing or nonexisting?

18        A.  Well, a --

19            MS. KAMKA:  I object, that's vague and

20   ambiguous.

21            Go ahead.

22        A.  If there is no account then there is

23   no -- there's nothing to review, meaning that if

24   John Ulzheimer is not a customer of Wells Fargo

25   then Wells Fargo can't do an account review

Page 37

1  inquiry on my account because there is no account.

2  There's nothing for them to look at.

3  BY MR. KIND:

4      Q.  Yeah, but you said your opinion is that

5  even if the account is closed, Wells Fargo would

6  be able to look at your -- do an account review,

7  correct?

8      A.  Yeah, I think -- I didn't say -- we were

9  talking about nonexistent.  We weren't talking

10  about closed.  Nonexistent means it doesn't exist.

11  Closed means it does exist, it's just a closed

12  account.

13      Q.  Okay.  But you agree that if you closed

14  an account with Wells Fargo they could continue --

15  but your information -- so let me start that

16  again.

17          You close your account with Wells Fargo,

18  it's a savings account or a checking account, and

19  your information remains on their system.  They

20  send you a letter, Thank you for your business,

21  your account is closed.

22          It's your opinion that they could

23  continue to access your consumer reports through

24  account review inquiries?

25      A.  If --

Page 38

1            MS. KAMKA:  Object to form.

2       A.   Again, if -- you're using kind of an odd

3  example, checking and savings.  Normally banks

4  don't do account review inquiries for checking and

5  -- for deposit accounts.  Normally they're for

6  liabilities.

7            So in your scenario, I -- an account

8  exists.  I guess theoretically if Wells Fargo

9  wants to buy a bunch of credit reports for people

10 who have checking accounts with them, I guess if

11 they want to spend their money that way, sure.

12 It's an account.

13      Q.   Okay.  So the answer is yes?

14      A.   Yeah.  I mean, an account is an account,

15 right.  There's different types of accounts.

16 Normally -- well, I don't know that I've ever seen

17 a bank do an account review inquiry on a deposit

18 account.  They almost -- well, they'll always do

19 it on accounts that were like borrower-lender type

20 accounts, or where there's a liability.

21      Q.   So let me change the hypothetical,

22 because it seems that that's causing a bit of --

23 so let's change it.

24            The hypothetical is a mortgage account,

25 and it's for $150,000 and the customer pays it off

Page 39

```
 1    every single month.  30 years later they pay off
 2    the entire balance, and the entire balance is over
 3    and the bank sends a letter, Thank you for all
 4    your payments, you don't owe us any more money,
 5    the lien is removed, and your account is closed.
 6            Can that bank continue to do account
 7    review inquiries?
 8        A.  Sure.  There's still an account.  It just
 9    happens to be a paid-off and closed account.
10            MS. KAMKA:  Okay, Michael, when you get
11    to a stopping point can we take a quick break?
12            MR. KIND:  Let me just finish up this --
13    a couple questions, if you don't mind.
14    BY MR. KIND:
15        Q.  Could you tell me where you -- in any
16    cases you've testified as to this opinion that you
17    just gave, have you ever given that opinion in any
18    other case before?
19        A.  Which -- you mean opinion from my report,
20    or just the discussion that we're having?
21        Q.  The discussion that we're having.
22            MS. KAMKA:  I just object --
23            MR. KIND:  Let me be more clear.
24            THE WITNESS:  Okay.
25            MR. KIND:  I'm sorry.
```

Veritext Legal Solutions
866 299-5127

1          THE WITNESS:  Yeah, which opinion are you

2    asking me?  Which sentence do you want to kind of

3    tag, and then we'll go from there.

4    BY MR. KIND:

5        Q.  All right.  Your opinion that you just

6    gave that even if an account is closed and paid

7    off, a user could still continue to access --

8    continue to do account review inquiries.  Have you

9    ever given that testimony or put that in a report

10   before this case?

11       A.  I almost certainly have.  I just have to

12   remember.  I mean, there's a difference between

13   testimony versus writing a report, right.  So I'm

14   just trying to remember if it was testimony like

15   what we're doing right now versus just a report

16   like what I did back in November.

17          I honestly don't remember.  I know I've

18   done it at the very least in report format.  I

19   just can't remember if I've done it in testimony

20   format.

21          MR. KIND:  Okay.  I'm happy to take a

22   break now, if that's good with you.  You want to

23   take five minutes?

24          MS. KAMKA:  Yeah, five minutes will work.

25          THE VIDEOGRAPHER:  The time is 2:09 p.m.

Page 41

1    we are now off the video record.

2            (Recess)

3            THE VIDEOGRAPHER:  The time is now 2:20

4    p.m.  We are now back on the record after a short

5    break.

6    BY MR. KIND:

7        Q.  All right.  Are you aware of case law, of

8    any cases or court, that has held that once an

9    account is closed the user is not able to do an

10   account review inquiry?

11           MS. KAMKA:  I just object that it's

12   outside the scope of the deposition and calls for

13   a legal conclusion.

14           You can answer.

15       A.  No, sir, I'm not aware of any case law

16   that says that once an account is closed you're no

17   longer allowed to do an account review inquiry.

18   BY MR. KIND:

19       Q.  Are you aware of any, besides for

20   Mr. Hendricks, any other experts who believe that

21   once an account is closed that a user is not able

22   to do an account review inquiry?

23       A.  I -- and we're getting dreadfully close

24   to me guessing here, but I'll give you my best

25   estimate.  If I remember correctly, I think the

Page 42

1    cases that I've been involved with where this

2    issue with the postbankruptcy account review

3    inquiry has been the, kind of the primary issue, I

4    want to say that Evan has always been the expert

5    on the plaintiff's side, I guess if there was an

6    expert on the plaintiff's side.  So I think it

7    always has been Evan's, but I can't tell you that

8    with 100 percent certainty.

9         Q.  Do you -- have you ever written any

10   article that's -- where you express your opinion

11   that after an account is paid off and closed that

12   a user could continue to do account review

13   inquiries?

14        A.  No.  That's not generally the type of

15   article that I would write.  That seems -- that's

16   a little complex for my blogging, and so no, I

17   wouldn't have written about something like that.

18        Q.  Have you ever written that in a book?

19        A.  I don't believe so.

20            Bless you.

21        Q.  Have you ever seen your opinion -- okay.

22   So when I say your opinion, I'm talking about this

23   opinion that we just spoke about before the break,

24   that once a mortgage gets paid off and closed a

25   user could still access -- could still do an

Page 43

1    account review inquiry.

2            So have you ever seen that written by --

3    in any -- let me start it again.

4            Have you ever seen that opinion written

5    down by anyone else in a book or an article?

6            MS. KAMKA:  Michael, I'd just like to

7    object that the statement you made about the

8    opinion, you used the phrase mortgage.  I'm not

9    sure if that was -- I think that misstated his

10   testimony.  But if you could just clarify the

11   opinion you're working with.

12           MR. KIND:  All right.

13           MS. KAMKA:  You can answer, if you can.

14      A.   I don't know -- I don't know that I've

15   ever seen -- I don't read a lot of books about

16   credit.  When I do read stuff it's usually

17   articles that are written either by reporters or

18   bloggers, and I don't -- honestly don't know that

19   that has ever been -- again, that's a complex

20   topic that the layman doesn't normally find a lot

21   of interest in.  So I don't know that I've ever

22   read -- I've certainly read tons of articles and

23   written tons of articles about inquiries, but

24   nothing kind of as specific as this issue of post

25   bankruptcy account review inquiries, read or

Veritext Legal Solutions
866 299-5127

1  written.

2       Q.  Well, my -- all right.  My question

3  wasn't post bankruptcy, it was if an account was

4  paid off and closed.  Does that change your

5  answer?

6       A.  No, same answer.

7       Q.  Okay.  And also, I said mortgage, but if

8  it was another type of loan, a car loan, would

9  that change your answer?

10       A.  No, sir.

11            MS. KAMKA:  Object to form.

12       A.  Sorry.  All types of liabilities.

13  BY MR. KIND:

14       Q.  Okay.  So then the obvious next question

15  is:  What is your opinion based on?  What did you

16  review to form your opinion?

17       A.  That it's permissible to do an account

18  review inquiry on an account post bankruptcy?

19       Q.  Let's --

20       A.  Because that's my -- that's the opinion

21  in my report.  So I --

22       Q.  Understood.  So let me ask it in a

23  different way.  The opinion that you discussed

24  today, which is that even if an account is closed

25  and paid off that a user could continue to do

Page 45

1   account review inquiries, what is that based on?

2          MS. KAMKA:  I'd just like to object that

3   it's outside the scope and it's not an opinion

4   that he's given in this case, but go ahead.

5          A.  Sure.  So, again, just because an account

6   is paid off either through a bankruptcy or --

7   excuse me, discharged through a bankruptcy or the

8   consumer pays it off, like in your 30-year

9   mortgage example a moment ago, the account still

10  exists, and accounts can be reviewed, which allows

11  for -- and that's straight out of the Fair Credit

12  Reporting Act permissible purpose, that it's

13  permissible to review an account.

14         There's also the legitimate business need

15  provision in the act as well, and there are

16  scenarios where a user of credit reports would

17  need to do an account review to perhaps for a

18  legitimate business reason.

19         Q.  All right.  I want to come back to

20  legitimate business reason in a second.

21         A.  Okay.

22         Q.  But for right now, I want to separate

23  your legal conclusions, I think they are, because

24  you're basing it on your interpretation of the

25  Fair Credit Reporting Act.  And I want to kind of

Page 46

```
1    separate it to your expert opinion, which is, I
2    think, is your experience and your knowledge of
3    the industry and your review and, you know, your
4    active participation in the industry.
5            So my question is:  Based on your expert
6    opinion, what did you rely on in concluding and
7    having the opinion that if an account is paid off
8    and closed an account review is permitted?
9            MS. KAMKA:  I'm just going to object,
10   again, that you're referring it to as his expert
11   opinion, but it's not an expert opinion offered in
12   this case.
13       A.  Again, the fact that it's closed, open,
14   paid off, not paid off, in default, paid on time,
15   that's -- all that is irrelevant.  The fact that
16   it's an account is what's relevant.  If there's an
17   account then accounts can be reviewed, which is
18   why you have account -- you can have an account
19   review inquiry.  So everything about the status of
20   the account is not meaningful.  It's the fact that
21   the account exists which allows for the review of
22   the account.
23       Q.  And my question is:  What is that based
24   on?  So I already asked you if you've seen that in
25   writing, and I think your answer was no.  So did
```

Page 47

1    anyone tell you, anyone in the industry tell you
2    that, what you just said?
3         A.  Well, again, it's in the Fair Credit
4    Reporting Act.  I've cited to this Jermaine versus
5    Bank of America case that I've cited to I think in
6    other expert reports.  So that's the basis for the
7    opinion.
8         Q.  So you're basing it on case law?
9         A.  Certainly I have cited to that in other
10   reports.  So, sure.  That seems to be an opinion
11   in other courts.
12        Q.  And would you categorize that as a legal
13   opinion, or are you still maintaining that that's
14   an expert opinion?
15            MS. KAMKA:  I just object.  That
16   misstates his testimony.  He never designated it
17   as an expert opinion.
18            Go ahead.
19        A.  No, it's certainly not a legal opinion.
20   I mean, I'm not a lawyer, so I'm not giving legal
21   opinions.  That's just my understanding of the --
22   what that court, the court has determined in that
23   case, and also my understanding of permissible
24   purpose in the Fair Credit Reporting Act.
25   BY MR. KIND:

                                        Page 48

1      Q.   Okay.  So let me just ask the open-ended

2  question.  Do you have anything else to add as

3  support for what you are saying regarding a closed

4  and paid off account?

5            MS. KAMKA:  Object to form.

6      A.   Well, other than the fact that just

7  because it's closed and paid off or discharged or

8  whatever doesn't extinguish the fact that the

9  account exists.

10     Q.   Do you have any other basis other than

11 what you put in your report and what you discussed

12 just now that you're forming that opinion on?

13     A.   No, that's it.

14     Q.   Are you aware of any -- let me start that

15 again.

16            Have you reviewed users of -- did you

17 review Ditech's policies and procedures?

18     A.   So I reviewed --

19            MS. KAMKA:  I just object to form.

20            THE WITNESS:  I'm sorry.  Can y'all go

21 through that again?  We didn't catch that over

22 here.

23            MS. KAMKA:  Want to ask the question

24 again, Michael?

25 BY MR. KIND:

Page 49

1     Q.  Sure.  Have you reviewed Ditech's
2  policies and procedures?
3          MS. KAMKA:  And I have an objection,
4  vague and ambiguous.
5     A.  So the only policy manual that I
6  reviewed, Mr. Kind, is Ditech's bankruptcy policy
7  manual.  But other than that, no.
8     Q.  I think you said before, but did you
9  receive all of the exhibits to Hardwick's
10  deposition?
11     A.  I don't know if I received all of the
12  exhibits to his deposition or not.  The documents
13  that you see listed on my documents reviewed list
14  on page 19 of my report, that's everything that I
15  received prior to the date of the report.  So if
16  there are documents there that are not -- or,
17  excuse me, if there are other documents that were
18  part of Mr. Hardwick's report -- I'm sorry,
19  deposition, that are not listed, then no.
20     Q.  Do you happen to know the Bates
21  numbers -- do you know if the bankruptcy policy
22  manual was Bates numbered?
23     A.  I don't recall if it had Bates labels or
24  not, my apologies.
25          MR. KIND:  Can we go off the record?

Page 50

1          MS. KAMKA:  Sure.

2          THE VIDEOGRAPHER:  The time is 2:32 and

3   we are now off the record.

4          (Off the record discussion)

5          (Recess)

6          THE VIDEOGRAPHER:  The time is now 2:34

7   p.m.  We are back after a break.

8   BY MR. KIND:

9     Q.  Okay.  All right.  Is Ditech a --

10  Ditech's relationship with Mr. Kamimura, in that

11  relationship is Ditech considered a lender?

12    A.  It's my understanding that they're a

13  servicer.

14    Q.  Okay.  So before in connection with the

15  definition of an account you had mentioned the

16  lender-borrower relationship, and you also

17  mentioned that in your report.

18          Does that apply also to a servicer?

19    A.  Sure, because servicers do account review

20  inquiries and pull credit reports.  So they would

21  be subject to the same permissible purpose rules

22  as like a first party lender would be.

23    Q.  Okay.  However, what is a servicer?

24    A.  So specific for mortgages, or just any

25  servicer in general?

Veritext Legal Solutions
866 299-5127

1      Q.   Let's start general and then go to

2  mortgages.

3      A.   Sure.  So servicers will generally

4  facilitate some of the functions that the lender

5  either chooses to not facilitator that have been

6  outsourced by the lender.  For example, credit

7  reporting is an example, dispute resolution is

8  another example, receiving payments is another

9  example.  And that holds true for student loan

10  servicing as well as mortgage loan servicing.  I

11  certainly don't consider myself to be an expert on

12  the intricacies of loan servicing, but that's my

13  understanding kind of at a high level.

14      Q.   Uh-huh.  Okay.  So from the time that

15  Ditech became a servicer on Mr. Kamimura's

16  account, can you tell me what services they were

17  serving?

18           MS. KAMKA:   I just object that it lacks

19  foundation, is vague and ambiguous.

20      A.   Other than credit reporting, I don't know

21  what services they were providing to Mr. Kamimura.

22      Q.   Oh, I have a few other types of accounts

23  I wanted to ask you about.

24      A.   Okay.

25      Q.   Have you heard of a demand deposit

1    account?

2        A.   Yeah, it's a checking account.  A DDA.

3    That's kind of the layman's -- that's a formal

4    term for a checking account.

5        Q.   What is a savings deposit account?

6        A.   Well --

7             MS. KAMKA:  I object, lack of foundation.

8        A.   Sorry.  It's an interest-bearing account

9    where a customer could deposit monies with a

10   financial institution, financial services company,

11   and earn interest on that money.  So it's kind of

12   a, if you will, a place to park your money.

13   BY MR. KIND:

14       Q.   And how about an asset account?

15            MS. KAMKA:  Object to form.

16       A.   I'm not sure what an asset account is,

17   not a term that I'm familiar with.

18       Q.   All right.  Would you agree with me that

19   any part of your opinion that could be interpreted

20   as an opinion on the effect of a bankruptcy would

21   be outside the scope of your expertise?

22            MS. KAMKA:  I'd object as compound, and

23   to form.

24       A.   The effect of bankruptcy on what?  I

25   mean, I certainly am very knowledgeable about the

Veritext Legal Solutions
866 299-5127

1   effect of bankruptcy on a variety of things:

2   credit reporting, credit scoring, how a lender

3   feels about seeing bankruptcies on people's credit

4   reports.  And I have an understanding of what a

5   bankruptcy does to debt as well.  So if you could

6   be more specific.

7   BY MR. KIND:

8        Q.  Yeah.  And I have a different question

9   now.

10        So you said you have an understanding.

11   But do you have an expertise on what a bankruptcy

12   does to debt?

13        A.  Define expertise.

14        Q.  Would you say you're just as much an

15   expert on the effect of bankruptcy on debt as you

16   are on credit reporting?

17        A.  No.  I would say no.

18        Q.  Would you feel comfortable writing an

19   expert report and testifying about the effects

20   that a bankruptcy discharge has on a particular

21   debt?

22        A.  I don't know.  I'd have to think about

23   that.  I haven't really ever been asked to do

24   that, so I haven't really ever contemplated doing

25   that.  I mean, I would certainly disclose to the

Page 54

1  attorney that wanted to retain me that almost -- I

2  mean, you almost said it how I would say it, that

3  I don't -- relative to my expertise in credit

4  reporting and scoring, I wouldn't put bankruptcy

5  on the same shelf as those two, and then he or she

6  would have to decide if I was the right person for

7  that job.

8          MS. KAMKA:  Michael, Don's back with the

9  documents.  Do you mind if you give us five

10  minutes to sort that out, or do you want to finish

11  this line of questions first?

12          MR. KIND:  Give me one second.

13          MS. KAMKA:  Sure.

14          MR. KIND:  Let me just finish, if you

15  don't mind.

16          MS. KAMKA:  Go ahead.

17  BY MR. KIND:

18      Q.  So were you asked in this particular case

19  to give an effect of Mr. Kamimura's bankruptcy on

20  the debt?

21      A.  No.  I'm familiar with what it did to the

22  debt, but no, I wasn't asked to offer any opinions

23  regarding that issue.

24          MR. KIND:  Okay.  Yeah, let's take five

25  minutes.

Veritext Legal Solutions
866 299-5127

1          MS. KAMKA:  Okay, great.

2          MR. KIND:  Thank you.

3          THE VIDEOGRAPHER:  The time will be 2:41

4    p.m.  We are off the record.

5          (Recess)

6          THE VIDEOGRAPHER:  The time is now 2:51

7    p.m.  We are back after a break.

8          MR. KIND:  Okay.  Oh, so Mary Kate, did

9    you get the Bates Numbers?

10         MS. KAMKA:  Don's getting that right now.

11   We found the document, but when we -- the document

12   that John looked at did not have the Bates numbers

13   on it because I think it was earlier.  But we're

14   checking the production to get you the Bates

15   numbers.

16         MR. KIND:  Thank you very much.

17   BY MR. KIND:

18      Q.  So, Mr. Ulzheimer, if an account is

19   discharged in bankruptcy and then closed by the

20   bank, is your answer the same as if that account

21   was paid off and then closed by the bank?

22         MS. KAMKA:  Object to form on what

23   opinion you're talking about.

24      A.  So the first sentence in your question

25   was if an account is discharged in bankruptcy, and

Page 56

1    so my entire premise and my first opinion is that

2    accounts are not discharged in bankruptcy, debts

3    are discharged.  So I don't know if you wanted to

4    reask it or whatnot, but that would be my response

5    to the question if it's as is.

6         Q.  And I try to make a point of -- and I

7    think I said it before.  I understand your opinion

8    and I didn't mean to mix them up.  So I appreciate

9    you pointing that out.

10        A.  Okay.

11        Q.  So let me reask the question, because I

12   did mean that.

13             If a debt is discharged in bankruptcy and

14   then the bank closed the account, is it your

15   opinion that it is okay for the bank to continue

16   to do account review inquiries?

17        A.  Yes, sir, it is.

18        Q.  When does that end?  In other words, when

19   does the bank have to stop doing account review

20   inquiries, after the account is paid off or

21   discharged -- I'm sorry, after the debt is either

22   paid off, discharged, or the account is closed?

23             MS. KAMKA:  Object to form, vague and

24   ambiguous.

25        A.  That's actually, that's an interesting

Page 57

```
 1    question.  I don't know that I've ever been asked
 2    that before, nor have I ever contemplated that if
 3    there is, in fact, an end date.  So I don't know.
 4    I don't have an answer for you, because I haven't
 5    ever really contemplated that.
 6         Q.  All right.  But your opinion is at least
 7    within the first year after the account -- after
 8    the debt is discharged or the account is closed
 9    that it is okay for account review inquiries to
10    continue?
11         A.  Well, I don't think qualify it based on
12    any amount of time.  So -- but certainly, yes,
13    within a year, again, as long as the account still
14    exists.  And in the scenario of Mr. Kamimura, the
15    account review inquiry occurred several years
16    after -- excuse me, occurred several years after
17    the filing date.  And so -- but yes, I mean,
18    within a year, certainly, because, again, the
19    account still exists.  But I've never requested
20    the opinion based on some period of time elapsing.
21         Q.  You didn't, that's right.  In the opinion
22    there's no time.  So that's kind of where I'm
23    going.
24             So one year seems to be okay.  How about
25    five years later?
```

Page 58

1        A.   Yeah, I -- again, I think that kind of
2   almost fits the scenario here.   I mean, the filing
3   date was in August of '10, this account review
4   inquiry on Exhibit Number 2 is four years after
5   that date.   But, again, the account still exists.
6   I mean, it's on page 3 of this credit report in
7   the account section, so, sir, again I have no
8   problem -- I have no problem with that.
9        Q.   How about 10 years after an account -- so
10  let's be specific.   We're talking about an account
11  that is paid off and then closed by the bank.   Ten
12  years after the close date is it still okay to do
13  account review inquiries?
14       A.   Again, I don't know.   I don't know if
15  it's okay or not.   I don't know of anything in the
16  FCRA or in the credit bureaus' policies where it
17  says after some period of time elapses you're no
18  longer allowed to do account review inquiries.   So
19  I don't know.
20       Q.   Okay.   So somewhere between five and 10
21  years, or are you just not sure?
22       A.   Yeah, again, I haven't contemplated that
23  issue, and this scenario was four years.   And I'm
24  of the opinion that that's fine, because the
25  account still existed.   So I don't know of any

Page 59

1    policy or practice where once some amount of time
2    elapses that account review inquiries are no
3    longer permissible.  I don't know.  I don't know
4    if that's ever been brought up or discussed or
5    contemplated.  It's an interesting topic.
6         Q.  Yeah.  So your -- what if the borrower
7    dies?  So, you know, if he dies, he's no longer
8    alive, but the account, as you defined it, would
9    still exist.  Could the account review inquiries
10   continue?
11        MS. KAMKA:  I'm going to object as
12   compound.
13        A.  Systemically the answer might be no,
14   because the credit reporting agencies, once
15   there's a deceased indicator on a consumer's
16   credit report, the credit reporting agencies begin
17   to restrict access to that credit report for a
18   variety of reasons.  So from a systemic
19   perspective, the answer to your question may
20   actually be no.
21            But not necessarily, because there's
22   anything in the act that says you can't do an
23   account review inquiry on someone who's dead.
24   There's no language in there that suggests that.
25   So there may not be the ability to get the credit

Page 60

1   report because of years may restrict it.

2       Q.   Let me go back to the point, what we were

3   discussing before.  10 years, 10 years after an

4   account is closed, I understand you didn't

5   consider the exact time.  But there have to be at

6   some point it ends.

7           So could you tell me in your expert

8   opinion at what point do account review inquiries

9   have to end after an account is closed or paid --

10  after an account is closed or the debt is paid off

11  or discharged?

12          MS. KAMKA:  I'd object that it's

13  compound.

14          Go ahead, John.

15      A.   I don't have an expert opinion.  I don't

16  even have a nonexpert opinion on that, because

17  I've never -- I've never considered that.  It's

18  not something I can -- I don't have the answer for

19  you open off the top of my head.  That's something

20  I would have to mull on for awhile and contemplate

21  what that actually means.

22          And certainly there's going to be some

23  period of time where the lender no longer sees

24  value in doing an account review inquiry because

25  there's no benefit to them for doing so, or maybe

Page 61

1    there's no need to have an updated address for the

2    consumer any longer so maybe they just choose to

3    stop doing them.  But I don't know when that

4    tipping point is, or even if there is a tipping

5    point.

6         Q.  It sounds to me that what you're saying

7    is it's going to be up to the bank or to the

8    lender to determine when it ends?

9              MS. KAMKA:  I just object that it

10   misstates testimony.

11        A.  Account review inquiries are not free.

12   There is a cost involved to the bank when they do

13   these.  And so, you know, all these companies on

14   Mr. Kamimura's credit report listed in the

15   account -- and in the promotional inquiry section

16   paid, paid to do this.  There's a cost involved.

17             And so certainly it's up to them to

18   determine whether or not they still see value in

19   doing so and therefore spending the money to do

20   it, and they may eventually say, Okay, after X

21   number of years we see no more value, therefore

22   we're not going to do it any longer.  But I don't

23   know that to be true for Ditech or any other

24   lender.  That's just my understanding, because I

25   used to sell these services when I was at Equifax,

Page 62

1    that eventually they just choose to stop doing

2    them.

3         Q.  Is there any way that you're aware of

4    that a consumer could stop account review

5    inquiries on their account?

6         A.  No.  The only -- no.  There is no

7    systemic -- there is no systemic way that a

8    consumer can do something to restrict account

9    review inquiries, other than not having an account

10   with somebody.

11        Q.  So is there any way that a consumer could

12   request to not have an account with somebody?

13             MS. KAMKA:  I object, vague and

14   ambiguous.

15        A.  You mean after one has already been

16   established, or you mean in a relationship where

17   there never was one in the first place?

18   BY MR. KIND:

19        Q.  Let's talk about when one is established.

20   So we could use that hypothetical, Mr. Kamimura,

21   after the debt was -- let's use a different

22   hypothetical.

23             If someone pays off their account and

24   then they get a letter that the account is closed

25   and then that consumer wants to stop the account

Page 63

1    review inquiries or do something else and he wants

2    the account to go away, is there any way to do

3    that?

4         A.   I'm not aware --

5              MS. KAMKA:  Objection, compound.

6         A.   Sorry.  I'm not aware of any way that a

7    consumer can request that the account be purged.

8    BY MR. KIND:

9         Q.   How about the other scenario that you

10   mentioned, which is if an account never existed

11   before.  Is there a way a consumer requests that

12   no account ever be opened?

13        A.   Sure.  I mean, the consumer obviously

14   controls that relationship, and if -- I mean, let

15   me think about -- of a lender.  I don't know,

16   Chase.  I don't have an account with Chase.  And

17   so I can choose to continue to never apply for

18   anything with Chase, and therefore there would not

19   ever be an account in my name with Chase, and so

20   therefore they wouldn't be able to do account

21   review inquiries or account management inquiries

22   on me, because there is no account.

23        Q.   As you defined account before, if Chase

24   somehow acquired all those attributes that we

25   spoke about, so they're a lender, they acquire

Page 64

1    your name and your social security number, your

2    email address, your address, and opened an

3    account, is that possible without your

4    involvement?

5            MS. KAMKA:  Object as vague and

6    ambiguous.

7        A.  It's certainly possible that that can

8    happen without my maybe overt knowledge, for

9    example, in the mortgage type of scenario where I

10   may apply for a mortgage loan and then the loan is

11   immediately sold to Chase at closing, but I never

12   applied with Chase, I applied with a mortgage

13   broker.  So that's certainly an example there

14   where I didn't go out and overtly try to open an

15   account with them.

16           But other than that, unless it's a case

17   of just true name fraud where someone is applying

18   for credit in my name and they happen to do it

19   with Chase, then I can't think of a scenario where

20   they would have gotten my information otherwise,

21   except maybe in a merger or they bought a

22   portfolio of credit cards from somebody where I

23   happen to be an existing credit card customer.

24           MS. KAMKA:  Michael, I don't want to

25   interrupt you, but we have the Bates range when

Page 65

```
 1    you want it.
 2            MR. KIND:  Yeah, if you could let me know
 3    now.
 4            MS. KAMKA:  It's 388 through 441.  Oh,
 5    sorry, 338 through 441.
 6            MR. KIND:  Thank you.
 7            MR. KIND:  Okay.  We'll come to those in
 8    a second.
 9    BY MR. KIND:
10        Q.  I want to turn back.  We discussed
11    briefly about the terms of an account, you spoke
12    about the terms and conditions.  Could you define
13    again what the terms -- how you understand the
14    word terms?
15        A.  Sure.  So terms can be -- when you say
16    terms of an account I think of two things, okay.
17    One would be all of the legal language that you
18    agree to when you apply for or open an account
19    and -- or click on the little button that says you
20    have read the terms and you agree to the terms,
21    which, you know, I don't have any scientific
22    evidence of this, but I can probably say
23    anecdotally probably the majority of people don't
24    read that stuff.  So the terms.
25            And then the second way I would define
```

Page 66

1    terms would be the more consumer facing terms of

2    an account.  So, for example, your credit limit or

3    the interest rate or your annual fee or the

4    amortization schedule of a loan.  So those are the

5    terms that I think most consumers would be more

6    familiar with.

7           And then also kind of the legalese kind

8    of behind the account, if you will.

9        Q.  So when a bank does an account review are

10   they trying to see if the consumer is meeting the

11   first or the second definition of the terms?

12          MS. KAMKA:  Object, lack of foundation.

13       A.  I would suggest that they're -- well,

14   first off, a lender can do an account review run

15   for a variety of purposes internally.  But I don't

16   know of any account review run that would be --

17   most of the time account review run is done from a

18   risk perspective, anyway, to determine if the

19   consumer is still performing credit-wise in such a

20   way that the lender still feels comfortable doing

21   business with them.  And that would be kind of in

22   an unsecured type of relationship like a credit

23   card account.  But I'm not aware of anything that

24   the initial legalese, meaning the terms of the

25   account that you agree to when you open it, are,

Page 67

1   you know, being revisited because of an account
2   review.  But, again, I don't work for a lender, so
3   maybe that is something that they consider.
4        Q.  So generally they're looking for -- is it
5   fair to say that generally they would be looking
6   for the second definition, which is to make sure
7   that the payments are on time, that the interest
8   rate should continue to stay what it is, and, you
9   know, that they have the ability to make their
10  payments?  Is that right?
11            MS. KAMKA:  I'd just object, it's
12  compound, calls for speculation, and lack of
13  foundation.
14        A.  Yeah, I mean, it's not uncommon for a
15  lender to do an account review or an account
16  management run because they want to make sure that
17  they still -- that the consumer still poses the
18  level of risk that they're comfortable with under
19  the current terms of the account, such as the
20  interest rate and the credit limit, for example.
21        Q.  Okay.  In Mr. Kamimura's case, he had a
22  bankruptcy discharge in April 2014.  What were the
23  terms of his account after April 2014?
24        A.  Other than the balance --
25            MS. KAMKA:  Object, sorry, object to

Page 68

1    form.

2         A.   Other than the balance being zero, I

3    don't know what the terms of Mr. Kamimura's HELOC

4    were at that time.

5         Q.   Okay.   So you know that the balance was

6    zero?

7         A.   It's what it shows on the credit report,

8    so I'm assuming if that's accurate, the balance

9    appears to be zero.

10        Q.   Okay.   So let's assume that that's

11   correct.   So the balance is zero.   Could the

12   interest rate have been anything greater than

13   zero?

14        A.   Well --

15             MS. KAMKA:   Object, calls for

16   speculation.

17        A.   Yeah, I don't know what the interest rate

18   was.   Generally when you have an interest rate it

19   is greater than zero, but I don't know if you

20   would apply an interest rate to a loan that has

21   been closed.   So I don't know what the interest

22   rate could or would have been.   But normally when

23   there is an interest rate it's greater than zero.

24   BY MR. KIND:

25        Q.   What about the monthly payment?   Is it

Page 69

1    possible -- obviously the monthly payment would
2    have to have been zero as well, correct?
3         A.  Yes, sir.  If there's -- if there's a
4    zero balance then obviously you wouldn't be making
5    payments on it, so there would be no payment due.
6         Q.  And this was a mortgage, so there would
7    be no annual fees as far as you're aware, correct?
8         A.  Again, the credit report doesn't indicate
9    annual fees associated with an account.  So I
10   don't -- I wouldn't know if it has an annual fee
11   or not.
12        Q.  All right.  Could you tell me a scenario
13   where what we just discussed, there's a zero
14   balance and the scenario where it's possible for
15   the consumer to violate those terms in any way?
16             MS. KAMKA:  I'll just object to form.
17        A.  I'm sorry, to violate the terms of what?
18   BY MR. KIND:
19        Q.  Of that specific debt and that account.
20             MS. KAMKA:  Same objection.
21        A.  I can't off the top of my head think of
22   anything that the consumer can do to violate the
23   terms of the account.
24   BY MR. KIND:
25        Q.  And would the consumer have to do

                                        Page 70

1    anything to continue to meet the terms of that

2    account?

3         A.   I don't believe so, but I wouldn't know,

4    because I don't know what the terms are.

5         Q.   Well, we know that the terms -- that the

6    balance is zero.  So which other terms are you

7    saying that you don't know what they are?

8         A.   Well, I don't know what the terms of the

9    account are at all, other than the fact that it's

10   got a zero balance.  And so I don't know what

11   Mr. Kamimura could or could not do to either

12   violate or continue to comply with the terms of

13   the account.

14        Q.   Okay.  Could you give me an example of

15   what other terms might exist?  So we know that

16   this is a junior mortgage and it was discharged in

17   bankruptcy and it was being reported with a zero

18   balance.  Could you give me a scenario of what

19   other things -- what other terms might have

20   existed, if you know?

21        A.   After the bankruptcy?

22        Q.   Yes.

23        A.   I can't think of any offhand.

24        Q.   Okay.  All right.  Now, what would you --

25   how would you describe or define industry

Page 71

1    standards?

2        A.  In my industry or just in general?

3        Q.  Sorry, in your industry.

4        A.  Sure.  So, well, in my industry -- well,

5    and let me just specify.  Credit recording,

6    because credit reporting and credit scoring aren't

7    the same industry.  But credit reporting, the

8    industry standards are as far as credit reporting

9    goes are defined in that Metro 2 manual that we

10   referenced a little while ago.  So that is the

11   industry standards guide for credit reporting.

12       Q.  Is there a separate manual of guides that

13   relates to credit pulls?

14       A.  Credit pulls.  The Metro 2 manual doesn't

15   address inquiries, which is what a credit pull is.

16   Certainly the Fair Credit Reporting Act has an

17   entire section dedicated to credit pulls.  But as

18   far as an industry standard, I mean, I guess you

19   could say that the Fair Credit Reporting Act is a

20   pretty good industry standard because it's the

21   law.  But as far as an industry-published standard

22   on credit pulls, other than what's in the

23   subscriber agreements between the credit bureaus

24   and their users, I'm not aware of anything.

25       Q.  Okay.  All right.

Page 72

```
 1              You should have there Exhibit 4, and that
 2   would be Exhibit 12 from Hardwick's deposition.
 3        A.   Okay, I have it.
 4        Q.   Have you seen this document before?
 5        A.   I have not.
 6        Q.   Does this look similar to the Fair Credit
 7   Reporting Act policies that you have seen?
 8              MS. KAMKA:  Object to form.
 9        A.   Fair Credit Reporting Act policies?  Is
10   that what you --
11   BY MR. KIND:
12        Q.   Yeah, let me -- I said that.  But the
13   ones that you refer to in your opinion and that
14   you reviewed, the Bates numbers that we have --
15        A.   Which of -- which opinion are we talking
16   about?  The first one?
17        Q.   Let me start again.
18        A.   Okay.
19              MS. KAMKA:  Hey, guys, we're not getting
20   any audio on our end, but it -- can you guys hear
21   me?
22              THE WITNESS:  I can hear you.
23              MR. KIND:  Yeah.
24              MS. KAMKA:  Okay.  Was there just a long
25   silence there?
```

Page 73

1              MR. KIND:  Yes, there was.

2              MS. KAMKA:  Okay, great.  We just wanted

3    to make sure we weren't out of the deposition.

4              THE WITNESS:  Just to let you know from

5    my perspective, both of you guys are freezing from

6    time to time also, but I can still hear both of

7    you.

8              MS. KAMKA:  Thanks.

9              MR. KIND:  I'm also having some freezing.

10   All right, okay.

11   BY MR. KIND:

12        Q.  All right.  So we're on Exhibit Number 4.

13   And, well, you said you haven't seen this before,

14   hmm?

15        A.  I have not, no, sir.

16        Q.  All right.  Well, let's go to, anyway, to

17   page 2, the second page.

18        A.  Okay.

19        Q.  I'm sorry, it's page 3.

20        A.  All right.

21        Q.  Page 3 in the middle, there's a warning.

22   And it says there, A CBR may never be requested

23   for the following.

24              Do you know what CBR stands for?

25        A.  I do not.  I don't see a -- I don't see

                                        Page 74

1   anything earlier on that says what -- oh, yes, I

2   do, I'm sorry.  CBR, credit bureau report.

3       Q.  Okay.  So back to page 3, it says, A CBR

4   may never be requested for the following.  And

5   then the second bullet point, the second point is

6   customer whose debt was discharged in bankruptcy

7   and the collateral is no longer secured.  Do you

8   see that?

9       A.  Yes.

10      Q.  Would you agree that this policy here is

11  consistent with industry standards, or is that

12  not?

13      A.  I don't know what the industry standard

14  is regarding pulling credit reports for consumers

15  that were discharged in bankruptcy and collateral

16  is not secured any longer, so I don't know if

17  that's -- I don't know if that's consistent or

18  inconsistent with industry standard.

19      Q.  Well, how many -- I thought that your

20  opinion was that if a debt is discharged in

21  bankruptcy and the collateral no longer existed

22  then as long as the account exists, account

23  reviews are okay.  Am I mis -- am I wrong?

24      A.  I think I've said that as long as an

25  account still exists then you can review the

Veritext Legal Solutions
866 299-5127

1   account.  I'm not sure we got into --

2        Q.  Okay.

3        A.  -- collateral being secured or unsecured.

4   I think we just talked about the account still

5   existing.

6        Q.  Yeah, that's true.  So let's talk about

7   collateral.

8            As I understand it, your definition and

9   your understanding of -- well, as I understand it,

10  your opinion about account reviews and the

11  existence of an account doesn't really concern

12  itself with whether or not there's collateral or

13  not.  As long as there's an account, regardless of

14  if there's collateral that is secured or not,

15  isn't it your opinion that as long as the account

16  exists there could be an account review?

17       A.  That's right.  The presence or lack of

18  collateral wasn't part of the opinion.

19       Q.  Okay.  So back to this here, which I can

20  represent to you is one of Ditech's policies.

21       A.  Okay.

22       Q.  So on page 3, I guess your opinion would

23  be that this is overly cautious or -- and this

24  doesn't -- this is not required under the

25  industry?

Page 76

1            MS. KAMKA:  Object to form.

2       A.   I'm quite certain that this is not

3  language in the industry standards manual, any

4  version of it that I've ever seen, and I've seen

5  it for 15 years.  Whether it's overly cautious or

6  not, I don't know.  This is the first time I've

7  ever seen it, and I don't know other than the

8  words on -- I don't know.

9            The date also postdates the date of the

10 inquiry, so I don't know, other than what it says,

11 I don't know if it's just a policy that Ditech has

12 or whether or not it's conservative or aggressive.

13      Q.   Okay.  And you said so the industry

14 standards or any version that you've reviewed, are

15 you talking about Metro 2?

16      A.   The Metro 2 manuals, the credit reporting

17 resource guides that are published every year.

18      Q.   So the Credit Report Resource Guide, is

19 that the same as Metro 2, or is that something

20 else?

21      A.   Yeah, the Credit Reporting Resource

22 Guide, or the CRRG, some people informally refer

23 to that as the Metro 2 manual.  And --

24      Q.   Understood.

25      A.   No, no, that's fine.  And the reason we

Page 77

1   do that is because saying Credit Reporting

2   Resource Guide over and over again gets to be a

3   pain in the ass, so it's easier just to call it

4   the Metro 2 manual.

5       Q.  Okay.  Is it your opinion that as far as

6   account reviews go, the industry doesn't concern

7   itself with whether a bankruptcy is filed as

8   opposed to a bankruptcy being discharged, but it

9   just relies on whether or not account exists?

10      A.  Well, the industry standards manual

11  doesn't address that issue at all.  It's not --

12  it's -- I guess to use a lawyer term like maybe

13  you would use, it's silent on that issue.  So

14  really it's up to all users of credit reports who

15  have user agreements with credit reporting

16  agencies to make their own decision as to what --

17  whether they're -- when they're accessing their

18  credit report whether they have permissible

19  purpose to do so.

20      Q.  Have you ever seen anyone in the industry

21  have a policy that makes a difference for account

22  review whether an account is filed in bankruptcy?

23      A.  I -- no, but that's -- I don't

24  normally -- that's not usually an issue that I'm

25  asked to address, and so the answer is no, simply

Page 78

1    because that's not something that I would normally

2    do.

3        Q.  Okay.  Well, then we have here Exhibit 4.

4    Other than this, have you ever seen any document

5    from within the industry talking about account

6    reviews and when they can happen and when they

7    cannot happen in connection with a bankruptcy?

8          MS. KAMKA:  Object to form.

9        A.  Well, just -- you know, just to be fair,

10    this doesn't refer to account reviews.  So I would

11    say that this doesn't even refer to account

12    reviews, unless I'm missing something.  This just

13    talks about pulling a credit report.  But the

14    answer to your question is no.

15        Q.  Well, isn't account review pulling a

16    credit report?

17        A.  It is, yes.

18        Q.  Okay.  All right.  Now, what reason did

19    Ditech have to access Mr. Kamimura's consumer

20    report after April 2014, after the discharge?

21          MS. KAMKA:  Object, lack of foundation.

22    Go ahead.

23        A.  I don't know what their specific reason

24    was for requesting Mr. Kamimura's credit report.

25    BY MR. KIND:

Page 79

1          Q.   Could you give me a possible reason, what

2    they might have wanted?

3               MS. KAMKA:   Objection, calls for

4    speculation.

5               Go ahead.

6          A.   I don't know this to be true or not.  I'm

7    just going to give you an example of why someone

8    may want a credit report.  But, again, this isn't

9    specific to Ditech.

10              For example, if they need an updated

11   address to send a surplus of escrow funds, for

12   example.  If they need an updated address to send

13   some tax-related documents.  That could be a

14   reason why you would do an account review pull.

15   BY MR. KIND:

16         Q.   Is there anything else?  So the first one

17   is looking for an address.  Is there something

18   else that they might want to look at a consumer

19   report to find?

20              MS. KAMKA:   Same objection.

21         A.   Yeah, there may be.  I just don't know

22   what that exhaustive list might be.

23   BY MR. KIND:

24         Q.   That's kind of what this case is about,

25   and I'm trying to see if you could help me out and

Page 80

1    just list them off of what you think might be a
2    possible permissible purpose.
3           So we have an address.  Is there anything
4    else you can think of that they might try to find
5    for someone who has a zero balance?
6           MS. KAMKA:  I just object that it calls
7    for speculation and is outside the scope of his
8    opinion.
9           Go ahead.
10     A.   Yeah, I -- again, that's not my job.  So
11   I would be completely guessing.  So I don't know
12   what else they might need from a credit report
13   after the bankruptcy.
14   BY MR. KIND:
15     Q.   Okay.  Whose job do you think it is?  Do
16   you think it's Ditech's job to explain that?
17          MS. KAMKA:  I'd object, calls for
18   speculation, lack of foundation.
19     A.   I'm sure there are people who are
20   mortgage lending experts who might give you three
21   pages of reasons why they may need to do an
22   account review after a bankruptcy.  I just -- I'm
23   not that person.
24   BY MR. KIND:
25     Q.   Okay.  Did you speak with anyone at

                                      Page 81

1    Ditech in connection with this case?

2         A.  No, sir, I did not.

3         Q.  Did you speak to anyone other than your

4    attorneys in connection with this case?

5              MS. KAMKA:  Objection, vague.  We do not

6    represent Mr. Ulzheimer.

7              MR. KIND:  I'm sorry.

8    BY MR. KIND:

9         Q.  Did you speak to anyone other than

10   Ditech's attorneys in connection with this case?

11        A.  No, sir, just -- just the two other

12   attorneys on the line here.

13        Q.  All right.  What else do we have?  Okay.

14             Yeah, I'm going now to your second

15   opinion, and I just have a few questions.

16        A.  Okay.

17        Q.  I think you -- well, let me ask you.  You

18   don't consider yourself an expert on emotional

19   distress, correct?

20        A.  No, sir, I don't.

21        Q.  So any testimony or opinion relating to

22   emotional distress would be outside the scope of

23   your expertise.

24        A.  Yes, sir.  I don't offer testimony on

25   emotional distress because I don't have a -- I'm

Page 82

```
 1   not medically trained like that.
 2        Q.   How do you define the term economic harm?
 3        A.   Monetary.
 4        Q.   Okay.  Well, sometimes emotional distress
 5   could be economic harm, or no?
 6             MS. KAMKA:  Objection, outside the scope,
 7   lack of foundation, calls for speculation.
 8        A.   Maybe I should be more specific, then.
 9   I'm not offering -- none of my opinion, even the
10   title of the opinion, has anything to do with
11   emotional distress.  So it would be economic
12   damages outside of emotional distress allegations
13   of damages, such as higher interest rates,
14   declinations of loans, higher insurance premiums,
15   the loss of a job, things like that.
16   BY MR. KIND:
17        Q.   Would you consider privacy to be under
18   the economic harm or under emotional distress?
19             MS. KAMKA:  Object to form.
20        A.   I don't know that I would put it under --
21   I mean, I'm not an expert on emotional distress,
22   and so I don't know what would belong underneath
23   that umbrella.  Privacy, I don't consider that to
24   be -- that may be something completely separate on
25   its own.
```

Veritext Legal Solutions
866 299-5127

```
 1   BY MR. KIND:
 2       Q.  Okay.  But an invasion of privacy, if
 3   someone feels that their privacy has been invaded,
 4   that would not fall under economic harm, correct?
 5       A.  Not in my mind.  I mean, economic damages
 6   are pretty straightforward, either you were or you
 7   were not charged a higher interest or a higher
 8   premium.  The reason behind it can be explored,
 9   but I don't know if privacy fits into that.
10       Q.  On the issue of Ditech being a potential
11   target for hackers --
12       A.  Okay.
13       Q.  -- would you agree with me that companies
14   similar to Ditech are frequent targets of hackers?
15       A.  I --
16           MS. KAMKA:  Object, calls for
17   speculation.
18       A.  Yeah, I don't -- I need to think about
19   that.  I don't know that there's a good source for
20   hacking targets.  There's a good source for
21   hacking victims and incidents.  But I don't know
22   of any source that tracks attempted hacks, so I
23   don't -- I would say I don't know, just because
24   that kind of information isn't readily available
25   that I know of.
```

Page 84

1    BY MR. KIND:

2        Q.  But just from your knowledge of the

3    industry, credit, identity theft, you'd agree with

4    me that big companies that have a lot of

5    information about a lot of consumers are often

6    targeted by hackers, correct?

7        A.  Sure.  I would agree with that because

8    there are well published examples of large

9    companies that are victims of hacking.

10       Q.  And are you -- are you aware that

11   Nationstar Mortgage Company was hacked at some

12   point?  Have you heard of that?

13       A.  I have heard of Nationstar.  I'm not

14   familiar with any sort of hacking incident

15   involving Nationstar.

16       Q.  Have you heard of any other mortgage

17   lenders or servicers that have been hacked?

18       A.  I have not.

19       Q.  Have you looked?

20       A.  No.  I was looking specifically for

21   Ditech or Green Tree hacking incidents, and there

22   aren't any.  Maybe they're better at protecting

23   their data than everyone else is.

24       Q.  And, like you said before, you would only

25   be able to find out if the hack was successful,

Veritext Legal Solutions
866 299-5127

1    not if there was an attempt, correct?

2         A.   Right, yes.   The organizations that track

3    that crime track successful incidents of hacking,

4    not attempted hacks.

5         Q.   All right.   I want to turn back to

6    something we talked about before briefly about if

7    a -- someone who obtained a consumer report, if

8    they could sell that information to third parties,

9    okay.   So --

10        A.   Well, hold on.   You asked about users

11   doing that.   There are companies that broker

12   credit reports, but they're not users of credit

13   reports.   And so just to make sure we delineate

14   between the two.

15        Q.   Yes.   So let's start with that, then.   So

16   could you explain the difference between a user

17   and companies that do actively sell information to

18   third parties.

19        A.   Sure.

20             MS. KAMKA:   Object to form.

21        A.   So a user of a credit report would be,

22   you know, I think -- I can't remember the bank's

23   name.   I think we may have used Wells Fargo.   So

24   Wells Fargo pulling my credit report because I

25   went in and applied for a car loan.   They are the

Page 86

1    user of the credit report, okay?

2          Then you have a different category of

3    company referred to as either a reseller or a

4    broker.  And there are a good number of them as

5    well that will actually buy information from one,

6    two, or all three of the credit reporting agencies

7    and then turn around and resell that information

8    to other parties.  So there are companies like

9    that that do exist.

10   BY MR. KIND:

11        Q.  And are they selling -- what's the name

12   of those companies?  Do they have a term?

13        A.  Well, they're normally called resellers.

14   That's kind of the formal term.  And if you

15   read -- in the Fair Credit Reporting Act they

16   actually refer to obligations of resellers.  So I

17   think the formal legal term is reseller, but I

18   think the term, the kind of informal term that is

19   thrown around in my world is a broker, a credit

20   report broker.

21        Q.  Okay.  So for nonbrokers, let's use Wells

22   Fargo.  Well Fargo has information of what,

23   millions of people, let's say.  And are they able

24   to sell some information to third parties for

25   marketing or for other reasons?

Page 87

1          MS. KAMKA:  Object, calls for

2     speculation, lack of foundation.

3          A.  Credit report information or just any

4     information in general?

5     BY MR. KIND:

6          Q.  Let's start with general.  Do banks

7     generally sell general information to third

8     parties?

9          MS. KAMKA:  Same objection.

10         A.  Yeah, I believe that financial services

11    companies as long as they have your acknowledgment

12    or permission to do so will share your information

13    with a third party, normally, as you said, for

14    marketing purposes.

15    BY MR. KIND:

16         Q.  Would that generally just be name,

17    address, or would it also include recent

18    information from credit reports?

19         MS. KAMKA:  Same objection.

20         A.  So it definitely would not include credit

21    report information or what some people refer to as

22    regulated data, because Well Fargo is not a credit

23    bureau.  So they're not set up to be -- they're

24    not set up to comply with the obligations of a

25    company that actually sells or discloses credit

Page 88

1    reports.  So they can't do that.

2        Q.  Okay.

3        A.  The resellers --

4        Q.  Could they give more general -- go ahead.

5        A.  I'm sorry.

6        Q.  No, no, you, please.

7        A.  I was going to say that these companies

8    that fall under that category of resellers that I

9    was talking about a couple minutes ago, they are

10   set up to comply with their obligations under the

11   FCRA, so they are considered consumer reporting

12   agencies.

13       Q.  Okay.  Would the regular banks -- so

14   they're not brokers, just regular banks --

15   someone's general information, would they include

16   some in between, so maybe the existence of a

17   bankruptcy, would that be included?

18       A.  I don't know.  I don't know.  I mean,

19   bankruptcy is a public record, so, I mean, I can

20   look up Mr. Kamimura's bankruptcy information if I

21   wanted to.  But the answer to your question is I

22   don't know.

23       Q.  Okay.  So what other kind of information

24   might a mortgage company sell about its consumers

25   to a third party?

Page 89

1          MS. KAMKA:  Objection, lack of
2     foundation, calls for speculation.
3          A.  I don't know.  I've never worked for a
4     mortgage company, so I don't know what -- or for a
5     lender, so I don't know what they could possibly
6     sell.
7     BY MR. KIND:
8          Q.  You spoke before that it costs money for
9     a user to inquire about a credit report, right?
10         A.  That's correct.
11         Q.  Do you know, how much is it for Ditech to
12    access Mr. Kamimura's consumer report?
13         MS. KAMKA:  Objection, lack of
14    foundation, calls for speculation.
15         A.  I don't know.  I don't know what their
16    price per unit is for account review inquiries or
17    any other type of inquiry, for that matter.
18    BY MR. KIND:
19         Q.  But you do know it costs them something.
20         MS. KAMKA:  Same objection.
21         A.  Yes.  The credit bureaus charge for
22    account review runs, yes.  There is a cost
23    involved.
24    BY MR. KIND:
25         Q.  Is the price listed on the subscriber

                                        Page 90

1   agreement?

2            MS. KAMKA:   Same objection.

3        A.   Not necessarily.   Sometimes those

4   subscriber agreements will just kind of define the

5   high-end relationship between the parties, and

6   then when the account is -- the account with the

7   user is actually I guess onboarded is the term,

8   then the credit reporting agencies will set the

9   price for certain services or products that are

10  being purchased by the user, and that would

11  obviously depend on the nature of the relationship

12  between the parties.

13       Q.   You said the word onboard.   Can you tell

14  me what that is?

15       A.   Sure, so it's easier for me just to give

16  you an example, if you don't mind.   So let's say

17  that I open a car dealership, John opens a car

18  dealership, John's Used Cars, and I want to pull

19  credit reports to see if people who come onto my

20  lot are, you know -- if I can sell a car to them

21  through indirect financing.   So I apply for an

22  account with the credit reporting agencies, or one

23  of them, depending on how I want to do it.

24            I fill out an application, and if they

25  approve it then I sign a user agreement, and then

                                          Page 91

1   when my account goes through the onboarding

2   process, meaning that they actually set up the

3   price tag for the different products and services

4   that I'm going to eventually buy from them, that's

5   generally how the process works, or at least it

6   was when I was working for Equifax.

7        Q.   Okay.   When you were working at Equifax

8   would Equifax have been okay knowing that one of

9   the users of its information was accessing

10  consumer reports 10 years or 20 years after the

11  consumer's accounts were closed?

12          MS. KAMKA:   Object to form, calls for

13  speculation.

14       A.   I don't know.   I don't know that I ever

15  ran into that issue when I worked there, so I

16  don't know what the company's position on that

17  was.

18  BY MR. KIND:

19       Q.   Also, for an account discharged in

20  bankruptcy do you agree that, from everything you

21  reviewed, that account should be reported with a

22  zero balance?

23          MS. KAMKA:   Object as outside the scope

24  of this deposition.

25       A.   I think you meant debt discharged in a

Page 92

1   bankruptcy.

2   BY MR. KIND:

3       Q.  Yes.

4       A.  But yes.  The credit report should

5   reflect the accurate status of the account.  And

6   if the account has a debt that is zero, because

7   it's been discharged in a bankruptcy and nothing

8   is due and owing, then reporting it with a zero

9   balance would be the appropriate way to report it.

10      Q.  Do you happen to know in cases where a

11  furnisher might report a bankruptcy discharge and

12  then later on the balance reappears on the

13  consumer report, have you come across such a

14  scenario?

15          MS. KAMKA:  Object to form and calls for

16  speculation.

17      A.  I believe I have seen that happen.  When

18  you say cases, not cases as in lawsuits where I've

19  been an expert witness cases, but scenarios where

20  I've seen that, yes, because in some scenarios the

21  bankruptcy may not necessarily wipe out the

22  balance to zero, so therefore there is some amount

23  that's still due.

24      Q.  Is it possible for a furnisher after

25  reporting -- oh, Mary Kay, are you still there?

1           MS. KAMKA:  I can hear audio, but my

2     video is not here.

3           MR. KIND:  Do you want to go off the

4     record?

5           MS. KAMKA:  You know, I'm okay if my face

6     is not on the screen because I can hear you guys,

7     if you're okay with it.

8           MR. KIND:  I'm okay with that.

9           MS. KAMKA:  Okay.

10          MR. KIND:  John, you're okay with that

11    too?

12          THE WITNESS:  Yeah, I'm fine.  I'm fine

13    with that too.

14    BY MR. KIND:

15      Q.  Okay.  So have you ever had the scenario

16    where a furnisher reports a bankruptcy discharge

17    and then the bankruptcy gets reported on the

18    consumer report, but then later this appears and

19    the balance comes back not because it was an issue

20    with the bankruptcy, but either because it was an

21    error on the part of the furnisher or the credit

22    reporting agency?

23      A.  I can't think of an example that's that

24    specific, so the answer is no.

25      Q.  Is it possible for a furnisher of

Page 94

1    information to withdraw a reporting of bankruptcy
2    and rereport the balance and take away the
3    bankruptcy status?
4          A.  Yes, it is.  You mean systemically
5    possible?
6          Q.  Yes.
7          A.  Yes, the answer to your question is yes.
8    You can do that.
9          Q.  All right.  So on your opinion number
10   three, third paragraph -- we're back onto your
11   Exhibit 3, so it's your report.
12         A.  Okay.
13         Q.  In your opinion, your third opinion, you
14   rebut Mr. Hendricks' report by saying that he is
15   factually incorrect.  But what we discussed today,
16   it seems that what your opinion is is really an
17   opinion that's an expert opinion, but you didn't
18   really base it on facts, that an account review is
19   still allowed after an account has closed or paid
20   or off discharged in bankruptcy.  So is this
21   something that you're going to stand by, that it's
22   factually incorrect, or is it just opposing
23   opinion?
24              MS. KAMKA:  I just object to the form of
25   the question.

Page 95

1     A.  When you say third paragraph, are you

2  talking about the rebuttal to the first opinion?

3     Q.  Yes.

4     A.  Okay.  Give me a minute just to read

5  through it again, please.

6         So, yes, this is -- yes.  I -- what he's

7  saying is factually incorrect.  Bankruptcies do

8  not discharge accounts, they discharge debts.  So

9  what he says, I respectfully disagree with what he

10  says, which is that blah, blah, blah, included a

11  discharge for plaintiff's account, and then to

12  continue, blah, blah, blah, because no account

13  relationship existed between plaintiff and

14  defendant.  That's -- so my rebuttal was that

15  that's factually inaccurate.  Bankruptcies don't

16  discharge accounts, they discharge debts.

17     Q.  Understood.

18     A.  And I see what Evan is doing, which is

19  fine.  He's trying to kind of inject that misuse

20  of the word into his report multiple times, which

21  whatever, it is what it is.  It's my job to catch

22  that.  And so this is my rebuttal of that.

23     Q.  What about a business relationship, as

24  opposed to an account relationship?  We didn't

25  really talk about that.  What would the business

Page 96

1    relationship be between Ditech and Mr. Kamimura

2    after the discharge?

3            MS. KAMKA:   Object to form, the term

4    business relationship, and calls for a legal

5    conclusion.

6        A.   Yeah, I don't know that that was even

7    something I put in my report, but I don't know

8    what the business relationship is, other than the

9    fact that he's a former -- a former borrower who

10   filed bankruptcy and the lien was -- well, I mean

11   the debt was exhaust -- or was discharged in

12   bankruptcy.   But as far as the current business

13   relationship, other than the fact that there is a

14   former account, I don't know what the current

15   business relationship would be.

16   BY MR. KIND:

17       Q.   Well, I'm asking it at the time right

18   after the bankruptcy, so not right now.   But would

19   the business relationship consist of having an

20   account, and that's it?   Is that right?

21           MS. KAMKA:   Same objection.

22       A.   Well, I don't know what Evan meant when

23   he said, Plaintiff did not have an account or a

24   business relationship.   I don't know what he means

25   by that.   Clearly he and I disagree, and I think

Page 97

1    you and I respectfully disagree with each other,

2    that the account still existed.

3          As far as the business relationship, I

4    don't know what Evan means when he talks about a

5    business relationship.  And I'm pretty sure I

6    don't -- I didn't offer rebuttal to that.  I just,

7    again, pointed out that bankruptcies don't

8    eliminate accounts.

9       Q.   Okay.  Fair enough.

10          What about the relationship?  I think we

11   discussed that.  Well, let's talk about it for a

12   second, just relationship.

13          The total relationship as you understand

14   it between Ditech and Mr. Kamimura after the

15   discharge, did that consistent of just the account

16   and nothing else?

17          MS. KAMKA:  Object to form, and calls for

18   a legal conclusion.

19      A.   I don't know.  I don't -- I don't know

20   what the relationship was other than the fact that

21   he had a HELOC that was being reported by

22   Ditech/Green Tree, so I don't know what happens

23   kind of behind the scenes when the bankruptcy is

24   filed and discharged.  That's not really my

25   expertise.

Veritext Legal Solutions
866 299-5127

1    Q.  From everything that you reviewed so far,
2    there's a relationship of the account, and we got
3    your opinion on that, but you haven't seen
4    anything else in that relationship, correct?
5         MS. KAMKA:  Object to form.
6    A.  Just what's being reported to the credit
7    report, which is what Evan and I are talking about
8    is the credit reporting aspect of this.  This is
9    my knowledge of the relationship between Ditech
10   and Mr. Kamimura is what's spelled out in Exhibit
11   2, which is where their account is listed.
12   Q.  You haven't seen any evidence of a second
13   account between Kamimura and Ditech, correct?
14   A.  No, sir, I haven't.
15   Q.  And you haven't seen any evidence that
16   maybe there was a loan modification or attempted
17   loan modification, correct?
18   A.  No, sir, I have not.
19   Q.  And so from all the documents that we
20   have, all you've seen is this one account with the
21   credit reporting on it and the discharge, but
22   that's it that we have, just one account.  That's
23   the relationship, right?
24        MS. KAMKA:  Object to form of the
25   question.

Page 99

1       A.   Yes.   Yes, the only nature of the
2   relationship between Mr. Kamimura and Ditech is
3   what -- that I've seen is what is represented on
4   the credit report.
5            MR. KIND:   Now, I'm almost done.   Mary
6   Kate, is it okay if we take five minutes?
7            MS. KAMKA:   Yeah, absolutely.
8            MR. KIND:   I just want to look through --
9   let's go off the record.
10           THE VIDEOGRAPHER:   The time is 3:54 p.m.
11  We are off the record.
12           (Recess)
13           THE VIDEOGRAPHER:   The time is 4:11 p.m.
14  After a short break we're back on the record.
15  BY MR. KIND:
16       Q.   Okay.   Similar to what you saw with
17  Ditech, do companies generally have policies and
18  procedures in place for the Fair Credit Reporting
19  Act?
20           MS. KAMKA:   Object to form, lack of
21  foundation, calls for speculation.
22       A.   Sure.   I mean, I can answer from the
23  perspective of my expert work.   When it's a case
24  where policies and procedures are in question, it
25  almost across-the-board every single company that

Page 100

1  I've been an expert witness I guess for has had

2  voluminous policies and procedures with respect to

3  credit reporting and, consequently, the Fair

4  Credit Reporting Act compliance.

5  BY MR. KIND:

6      Q.  And have you also seen that companies

7  generally have policies and procedures relating to

8  inquiries?

9          MS. KAMKA:  Same objection.

10     A.  I don't know that I can recall that,

11 so -- just simply because it's such a kind of

12 narrow thin slice of credit reporting.  So I just

13 don't recall.

14 BY MR. KIND:

15     Q.  Okay.  But you -- okay.

16         Other than in this case have you seen

17 other companies that have policies, procedures,

18 relating to -- let me start again, because I want

19 to define a term.

20         Batch credit pulls, or -- what is a batch

21 credit pull or a refresher?  Are you familiar with

22 those terms?

23     A.  Yeah.  Batch or batch refresh, is that

24 what you're talking about?

25     Q.  Yes.

Page 101

1      A.   Okay.   So that's a credit reporting term,

2   and batch -- they kind of mean the same thing,

3   batch, meaning that they can be used

4   interchangeably.

5           Batch is just simply indicates that the

6   credit reporting agency is delivering information

7   on a large number of consumers in a

8   nontransactional environment, meaning they're not

9   doing it in a one-off scenario where like if you

10   walked into a car dealership and asked for

11   financing, they would just pull a credit report on

12   Michael Kind, versus, you know, Well Fargo, you

13   may have a credit card with them, they may be

14   doing their batch refreshes once a month or once a

15   quarter and they're pulling it on 20 million

16   people.

17      Q.   So do companies generally have policies

18   and procedures relating to these batch refreshes?

19      A.   Yes, almost always, yes.

20      Q.   Have you provided training to companies

21   on batch refreshes?

22      A.   When I was at Equifax, yes.

23      Q.   And would you charge or Equifax would

24   charge these users for the training?

25      A.   No, not specifically for the training.

Page 102

1    For the actual batch job, yes, but not necessarily
2    for the training.
3         Q.   Would the training also include a part
4    that talks about the law and permissible purpose?
5         A.   No.   That's -- again, that's up to the
6    user to do their due diligence with respect to
7    compliance with the law.
8         Q.   And then when you were working for
9    Equifax, Equifax can be concerned with a
10   certification from the user that they had a
11   permissible purpose, is that right?
12        A.   As part of the relationship, yes.   That
13   was part of the -- what you referred to earlier as
14   a subscriber agreement, where there is
15   acknowledgment that there is an obligation to
16   comply with the Fair Credit Reporting Act, which
17   obviously would include permissible purpose.
18        Q.   More than that, Equifax wouldn't go into
19   the user's business of trying to see what exactly
20   the permissible purpose is, correct?
21        A.   No, that's not necessarily true.   There
22   were limited scenarios where you would ask for
23   evidence of permissible purpose.   But by and
24   large, again, that was up to the user to do their
25   due diligence to be compliant.

Page 103

1        Q.   Okay.   Are you aware of any companies or

2    organizations that provide training to users of

3    information relating to batch refreshes in

4    connection with the relevant law?

5        A.   I am -- I am not.   That doesn't mean they

6    don't exist, I'm just not familiar with them with

7    respect to that unique scenario that you just

8    posed.

9        Q.   Okay.   What about just generally in

10   connection to inquiries?   Are there companies out

11   there that provide training for regulations and

12   laws relating to inquiries?

13       A.   There are certainly companies that

14   provide Fair Credit Reporting Act compliance

15   training and audits, which would encompass

16   permissible purpose, which is obviously where an

17   inquiry would come from.

18       Q.   Okay.   Can you name one or two companies,

19   if you can?

20       A.   I do it, so my company does it.   I'm

21   obviously a small fish, so I don't really consider

22   myself to be a competitor with the other large

23   companies that do it.   I know that there are law

24   firms that do it.

25            You know, I found using probably what

Page 104

1    most people do is just Googling Fair Credit

2    Reporting Act training and compliance and there's

3    a list of companies that advertise -- that buy ad

4    space for those terms.

5         Q.   How much would you charge to go into

6    Ditech and give them training on inquiries

7    specifically?

8         A.   Just on inquiries?

9         Q.   Yeah.

10        A.   I don't know that I would -- I would do

11   that.  I would almost do it -- I don't know.  I

12   don't really offer it on a very specific slice of

13   the FCRA compliance like that.  Mine is more of an

14   overall audit, everything that touches credit

15   reporting.

16        Q.   How much does that cost, roughly?

17        A.   It's -- it can be expensive, because some

18   organizations are massive.  You know, a small

19   company, you know, $10,000.  A large company could

20   be considerably more than that.

21        Q.   Like 100,000?

22        A.   Oh, no, I never -- I've never had

23   anything like that.  I've never had anything over

24   20.  But, again, if -- you know, Citibank or some

25   other massive global bank needed me to spend

Page 105

1    essentially a year of my life doing it, then

2    obviously the cost would be considerable.

3        Q.  Okay.  So a regular training session and

4    audit would be about 10 to 20,000?

5        A.  Yeah.  That's about right.

6        Q.  Okay.  All right.

7            Now -- oh, I wanted to ask you, so we're

8    back on your opinion number three on your report.

9        A.  Okay.

10       Q.  It talks about -- you spoke about how

11   that screen shot that you had from Ditech's

12   policies and procedures, it seems that your

13   opinion is that that relates to batch refreshes as

14   well as individual inquiries; is that correct?

15       A.  Yeah.  It's in rebuttal to Evan's opinion

16   that they didn't have -- that Ditech didn't have

17   any policies in place to ensure that account

18   reviews of credit reports were not done, I guess,

19   it failed to have a policy.  And I was simply

20   identifying that they do, and maybe he just missed

21   it.  And so that was the purpose of the screen

22   capture.

23           And this section doesn't necessarily

24   address the method of delivery, whether it's a

25   transactional inquiry versus a batch-related

                                        Page 106

1  inquiry.

2       Q.  Do you remember in reviewing

3  Mr. Hardwick's deposition, he testified that these

4  policies and procedures related to inquiries

5  related only to individual and not to batch

6  inquiries?  Do you remember seeing something about

7  that?

8       A.  I don't recall.  I don't recall seeing

9  that.  But, again, that last sentence in the

10 screen capture, just for your -- just FYI,

11 reviewing the account to determine if the customer

12 continues to meet the terms of the account is

13 considered a legitimate business need.  That -- if

14 you looked up the garden variety definition of an

15 account review run, that would be the sentence

16 that's in there.

17       So, again, I don't know -- that's just my

18 experience talking there, that that generally

19 would refer to as a batch run for account review.

20       Q.  Yeah.  So if it turns out true that

21 Mr. Hardwick's position -- so Ditech's position --

22 was that that screen shot refers only to

23 individual inquiries, do you disagree with them?

24       A.  No, I don't disagree with Mr. Hardwick.

25 And, again, I don't know that it's important,

                                   Page 107

1    because Evan just has the opinion that there isn't

2    any policy or procedure at all regarding account

3    reviews of credit reports, and my response is here

4    it -- I mean, this is specific to reviewing of

5    accounts.

6         Q.  And if hypothetically, let's say it's

7    true that Ditech's position is that that policy

8    that you're referring to from Ditech's bankruptcy

9    procedures manual, page 5, if it's Ditech's

10   position that that only relates to individual

11   inquiries and not to batch refreshes, do you agree

12   with Evan that Ditech does not have policies and

13   procedures relating to batch refreshes?

14        A.  I think the only way I would agree with

15   Evan is if Mr. Hardwick testified, We have no

16   policies regarding batch refreshes, rather than

17   Evan's interpretation of what somebody else may or

18   may not have said and not considering the screen

19   capture that I put.

20            I know he got this afterwards, so in all

21   fairness to him, he may not have even seen it.

22        Q.  Evan's report -- and I'm not trying to be

23   argumentative -- his expert report cites the place

24   in the deposition where Mr. Hardwick testified

25   essentially that.

Page 108

1          If you don't remember that testimony then
2    we can just move on.  Do you remember anything
3    about that, Mr. Hardwick talking about whether
4    this policy relates to batch refreshes as opposed
5    to individual?
6          A.  I do not.
7          Q.  Okay.  All right.
8              Now, I want to go back for a second and
9    to -- and give you a hypothetical.
10         A.  Okay.
11         Q.  Assuming that there's a bankruptcy
12    discharge, there's no lien on the account, Ditech
13    closes the account -- well, let me start again,
14    okay.
15             There's an account with Ditech.  It's
16    discharged in bankruptcy and it's a junior lien
17    and it's -- there's no more lien, there's no
18    balance after the discharge.
19             Also assume that there are no additional
20    terms on this account.  There's no annual fee,
21    there's no other thing that the consumer has to
22    do.  He has a zero balance, he has to pay zero
23    dollars per month, there's nothing left to do on
24    this account.
25             Would you say -- would you agree with me

                                        Page 109

1   in that scenario that there's no legitimate

2   business need to access the consumer's consumer

3   report?

4        A.   No, I wouldn't say there's no legitimate

5   business need.  It may be a different business

6   need other than, you know, your stereotypical risk

7   management.

8             But, again, like the one example I was

9   able to give you earlier about addresses, that

10  certainly could still apply.  And, again, if a

11  mortgage expert could list off other ones, then it

12  seems like there would be more -- there could be

13  several.

14       Q.   All right.  As to the hypothetical that

15  the lender, Ditech, does not need the consumer's

16  address for any reason, it doesn't need his phone

17  number and Ditech does not need the consumer's

18  social or any updated information relating to the

19  address, phone number, contact information, at

20  that point would you agree that there's no

21  legitimate business need at that point?

22            MS. KAMKA:  I object to the extent it

23  calls for a legal conclusion.

24       A.   No.  That would just eliminate my one

25  example that I gave you.  I don't know that it's

                                    Page 110

1    fair that that would eliminate every possible

2    example that exists that I just don't know or

3    can't think of.

4    BY MR. KIND:

5        Q.  All right.  But from all the examples

6    that you can think of today, could you tell me of

7    any legitimate business needs that Ditech had to

8    pull Mr. Cam more a's consumer report?

9            MS. KAMKA:  Object to the extent it calls

10   for a legal conclusion, calls for speculation.

11       A.  Yeah, again, that's outside of my area of

12   expertise.  And so I'm not going to be able to

13   give you a nice elegant list, other than the one

14   that I was able to think of which is you need an

15   address for a refund of escrow funds or need an

16   address because you need to send tax-related

17   documents, for example.

18   BY MR. KIND:

19       Q.  Do you believe that there is -- that it

20   is permissible, you know, in terms of the industry

21   that they deem it permissible to pull someone's

22   consumer report because you need their address to

23   send tax documents?

24           MS. KAMKA:  Same objection.

25       A.  If it -- that seems like a legitimate

                                        Page 111

1    business reason in my mind, I mean, so that that

2    seems like that would be a pretty garden variety

3    permissible purpose.

4    BY MR. KIND:

5        Q.   What happens if the legitimate

6    business -- what happens if the bank wanted to

7    pull the address because -- for statistical

8    reasons, for big picture reasons.  They were just

9    trying to compile how many people do we have, do

10   they all live in Las Vegas?  Is that a legitimate

11   business need?

12           MS. KAMKA:   Same objection.

13       A.   I don't know.  I don't know if that would

14   fall under a legitimate business need.  That's

15   outside of credit reporting, so I don't know if

16   that would be a legitimate business need for a

17   bank.  It might be.  That seems like a good

18   question for someone from a bank.

19   BY MR. KIND:

20       Q.   As far as credit reporting goes, do you

21   see it that the bank needs to have a legitimate

22   business need for each consumer, or can they just

23   have a big picture need and just try to get

24   statistics on everybody that they have to

25   determine, you know, some general stuff?  Is that

Page 112

1   okay to do account review inquiries?

2           MS. KAMKA:  Object to form, and calls for

3   a legal conclusion.

4       A.  Yeah, I don't -- I don't think so.  I

5   mean, if -- the permissible purpose language in

6   the act doesn't have any -- it doesn't qualify by

7   saying, Well, if most of the people have -- you

8   know what I mean?  It doesn't necessarily go like

9   that where X percent, but if we throw in these

10  other folks it's okay.  It doesn't -- it appears,

11  anyway, in my interpretation of it that if you're

12  going to pull 10 people's credit reports you need

13  to have a permissible purpose for all 10 people.

14  BY MR. KIND:

15      Q.  All right.  So I just want to wrap up

16  again the idea, the hypothetical before where

17  there's zero balance, there are no additional

18  terms, there's no tax forms, there's no extra

19  money in escrow, and let's say the bank agrees

20  that they don't need the address for any reason.

21          You don't have any reason sitting here

22  today to tell me what a legitimate reason why that

23  company might need to do an account review,

24  correct?

25          MS. KAMKA:  Objection, asked and

                                    Page 113

1    answered.

2        A.   Yeah, again, we're just eliminating my

3    one or two examples that I was able to think of.

4    There may be 50 more that I just don't know

5    because I'm not a mortgage expert.

6            But certainly if you -- you just

7    eliminated the -- you know, the two that I had,

8    but there may be more.  But we know that the

9    account still exists.  And so if there's a

10   legitimate business need, then that would be

11   permissible.

12       Q.   Okay.  But you don't have any -- you

13   can't tell me any specific ones today other than

14   in the hypothetical I gave you, because I took

15   away all the ones that you had.  You don't have

16   any other examples, correct?

17           MS. KAMKA:  Objection, asked and

18   answered.

19       A.   That's correct, yes, sir.  Or no, I

20   don't.

21   BY MR. KIND:

22       Q.   All right, okay.  So now also I want to

23   ask you something about what you just said, which

24   is that if -- do you have -- do you make a

25   distinction between when an account exists that

                                      Page 114

```
 1    you're saying that you could do an account review,
 2    does it matter if there's a legitimate business
 3    need on top of that, or all that they need is to
 4    have an account and then they can do an account
 5    review?
 6              MS. KAMKA:  Object to form, it's
 7    compound.
 8    BY MR. KIND:
 9         Q.  Yeah.  Did you understand the question?
10    Let me --
11         A.  Yeah.  I'm not sure -- do you mind
12    rephrasing?
13         Q.  Yeah.  Yeah.
14              You said your opinion is that if an
15    account exists then it's okay to do an account
16    review, correct?
17         A.  Correct.
18         Q.  Does a user in addition to having an
19    account also need to have a legitimate business
20    need?
21              MS. KAMKA:  Object to form.
22         A.  If -- I don't know.  The legitimate
23    business need could be a second permissible
24    purpose.  I don't know the answer to your
25    question.
```

Page 115

1    BY MR. KIND:

2        Q.   Your opinion in this case is that an

3    account exists after a discharge, correct?

4        A.   That's right.

5        Q.   But whether or not there's an additional

6    legitimate business need that's required or if the

7    account existing by itself is enough, you're not

8    sure, correct?

9             MS. KAMKA:   Objection, I think that

10   misstates his testimony.

11       A.   Right, yeah.  I didn't go so far to say

12   you have to have -- check these three boxes in

13   order for it to be permissible, so I don't know if

14   there needs to be something on top of the fact

15   that the account still exists.

16   BY MR. KIND:

17       Q.   Do you know if just having an account is

18   a permissible purpose as determined by the

19   industry?

20            MS. KAMKA:   Object to form, and calls for

21   a legal conclusion.

22       A.   No, I mean, the language in the act says

23   that there has to be a legitimate business need.

24   BY MR. KIND:

25       Q.   So, yeah.  I'm not asking about the

                                    Page 116

1    legal, I'm asking in your industry, just having an

2    account itself is not enough to be a permissible

3    purpose, correct?

4              MS. KAMKA:  Object, vague and ambiguous.

5         A.  I don't know if just simply having an

6    account is -- you know, I don't know that that

7    checks the box.  I just don't know.

8    BY MR. KIND:

9         Q.  But the industry generally does use the

10   term legitimate business need in connection with

11   inquiries, correct?

12        A.  Well, the -- the industry doesn't -- the

13   industry defers to the user to determine if they

14   have a legitimate business need.  The industry

15   doesn't say, This is what you have to have in

16   order to have a legitimate business need.  That's

17   up for the user to determine themselves, whether

18   or not they have a legitimate business need.

19        Q.  If you were giving a training right now

20   or if we were using this video as a training for,

21   you know, an upcoming training that you were going

22   to do, would you tell the company that just having

23   an account is good enough, or would you say you

24   need an additional something?

25        A.  I wouldn't address that.  That's a legal

Page 117

1    question.  I don't address it from that
2    perspective.
3         Q.  And then so do you have enough
4    information to form an expert opinion as to
5    whether or not -- as to whether or not a
6    legitimate business need exists just because an
7    account exists?
8         A.  No, I'm not giving an opinion on that.
9         Q.  And you're also not giving an opinion if
10   a permissible purpose exists just because an
11   account exists, correct?
12        A.  Ask that again.  Or if you don't mind --
13   or she can read it back, whatever you want to do
14   is fine, I don't care.
15        Q.  I can ask it again.
16        A.  Okay.
17        Q.  Is it true you're not giving an opinion
18   that a permissible purpose exists just because an
19   account exists, correct?
20        A.  I'm not giving an opinion one way or the
21   other on that.
22        Q.  So correct, right?
23        A.  Right, if my answer indicates that you're
24   correct, then that's fine.  But I'm not giving an
25   opinion one way or the other on that.

Page 118

1       Q.  Yeah, but are you not giving an opinion

2   on -- are you not responding to my question, or

3   you're not giving an opinion on what I'm asking,

4   which is -- yeah.  So it's a little confusing, a

5   little unclear.  So let me ask it again.

6           Is it true that you are not giving an

7   opinion one way or the other as to if a

8   permissible purpose exists just because an account

9   exists?

10      A.  That's correct.  I'm not giving an

11  opinion one way or the other.

12      Q.  And what's the reason why you're not

13  giving an opinion on that?

14      A.  Because I --

15          MS. KAMKA:  Objection, argumentative.

16      A.  Because, again, I don't know if just

17  simply having the account is enough or if you have

18  to have an account plus a legitimate business need

19  or if they -- or if having an account is enough

20  and that is the legitimate business need.  I just

21  don't know one way or the other, so I can't give

22  you an opinion one way or the other.

23  BY MR. KIND:

24      Q.  Yeah.  If you had to lean towards one or

25  the other, which way would you lean?

                                        Page 119

1           MS. KAMKA:  Objection.

2    BY MR. KIND:

3       Q.  Are you more inclined to say that just an

4    account is not viewed by the industry and users

5    generally to be a permissible purpose?  Are you

6    more leaning towards users of information and the

7    industry generally sees an account as enough to do

8    an inquiry?

9           MS. KAMKA:  Object to form, objection,

10   asked and answered, and objection, outside the

11   scope of his expert deposition.

12      A.  I'm not leaning.  There is no variance in

13   which way I'm leaning.  I'm not leaning one way or

14   the other.

15   BY MR. KIND:

16      Q.  Have you ever seen a consumer report that

17   has a string of multiple chargeoff notations?

18      A.  Yes.

19      Q.  Do you believe those are accurate under

20   the FCRA?

21          MS. KAMKA:  Objection, outside the scope

22   of the deposition.

23      A.  Yes, I do believe that's accurate.  I've

24   been an expert in countless lawsuits where that's

25   the issue, and they've all been dismissed.  So

                                        Page 120

```
 1    yes, it's accurate reporting.
 2    BY MR. KIND:
 3         Q.  Is that because it's the accurate status
 4    for each month?
 5         A.  Yes.
 6              MS. KAMKA:  Same objection.
 7    BY MR. KIND:
 8         Q.  You said yes?
 9         A.  Yes, that's right.  As long as it was in
10    a chargeoff status for the month that it was
11    recorded as being a chargeoff, then it's correct
12    reporting.
13         Q.  If a consumer continues to make payments
14    on a mortgage and then that -- and then for some
15    reason those monthly payments or the entire
16    account --
17              MS. KAMKA:  Hey, Mike?
18              THE WITNESS:  Oh, we can't hear him.
19              MS. KAMKA:  Can you hear me, John?
20              MR. KIND:  I can hear you, but I can't
21    hear Mike.
22              MS. KAMKA:  Yeah, the same.  I don't know
23    how to get that message to him.
24              THE WITNESS:  He knows that we can't hear
25    him.
```

Page 121

```
 1              MS. KAMKA:  John, can you still see Mike?
 2              THE WITNESS:  I can still see him, but I
 3   know that he can't hear us and we can't hear him.
 4   I can't see you any longer.
 5              MS. KAMKA:  Yeah, my thing just went
 6   down.
 7              THE WITNESS:  Right.  We're wasting tape
 8   right now.
 9              MS. KAMKA:  We can go off the record -- I
10   guess we need his permission to go off the record.
11              (Brief recess)
12   BY MR. KIND:
13       Q.  All right.  Let's continue.
14              So the question I was asking was if
15   someone's making on-time payments for a mortgage
16   every month and then -- or expressed from the
17   credit report?
18              MS. KAMKA:  Hey Mike, you kind of went in
19   and out on that question again.
20              MR. KIND:  I'll start again.
21   BY MR. KIND:
22       Q.  If someone is making on-time payments on
23   a mortgage and then for some reason that account
24   is suppressed or deleted from the credit report,
25   does the credit score change because of that?
```

Page 122

1           MS. KAMKA:   Objection, outside the scope

2      of this deposition.

3           A.   That's a possibility.

4           Q.   What would it depend on?

5           MS. KAMKA:   Same objection.

6           A.   It could depend on the diversity of the

7      information on the consumer's credit report, it

8      can depend on the age of the mortgage loan that is

9      no longer on the credit report.

10     BY MR. KIND:

11          Q.   As a general rule would you agree that

12     post -- on-time payments on a consumer report will

13     generally provide a better credit score,

14     generally?

15          MS. KAMKA:   Same objection.

16          A.   Than what?

17     BY MR. KIND:

18          Q.   Than not having those -- not having that

19     account showing those positive reports.

20          A.   No, not necessarily.   I mean, certainly

21     you'd rather have something good on a credit

22     report than something bad on a credit report.   But

23     just simply having something good on a credit

24     report doesn't mean that your score is higher than

25     if it wasn't there.

Page 123

1        Q.   All right.  We discussed your three

2    opinions today, and you have a copy of your report

3    in front of you.

4        A.   Yes.

5        Q.   And do you have any other opinion in this

6    case?

7        A.   Not as I -- not as I sit here today.

8        Q.   And based on the all --

9        A.   Can you repeat that, Mike?  I'm sorry.

10            MS. KAMKA:  I can't hear Mike as well.

11   Mike, you're just coming in and out.

12            THE WITNESS:  Do you mind repeating that?

13            MR. KIND:  I'm not going to ask that

14   question, that's okay.

15   BY MR. KIND:

16       Q.   Is there anything in your current report

17   in front of you that you would want to change or

18   modify in any way?

19       A.   No, not really.

20       Q.   You say not really.  Is there something

21   maybe, a little?

22       A.   No.  I mean, to the extent we talked

23   about this, you have economic damages and you

24   brought up the whole issue of well couldn't

25   emotional distress cause economic damages.  The

                                           Page 124

1  only thing I would change is maybe make that a

2  little bit tighter.  Maybe do a better job of

3  defining economic damages.  But I think the point

4  was made that I'm not offering an opinion

5  regarding emotional distress.  But other than

6  that, no.

7      Q.  Do you plan to do any further research in

8  this case?

9      A.  I don't have any further research

10 planned, so at this point the answer would be no.

11      MR. KIND:  Okay.  I have no further

12 questions.  Mary Kate, did you have some

13 questions?

14      MS. KAMKA:  No, we don't have any

15 questions.

16      MR. KIND:  Okay.  Well, let's get the

17 time on the record so we can properly do that.  I

18 think we started at 10 -- so I'm on Pacific time

19 and we started at 10:00 o'clock and now it's 1:50,

20 1:49, so . . . three hours, 50 minutes, is that --

21 do you agree with that?

22      THE WITNESS:  That sounds fine.  Yeah,

23 that looks like it's right, so we have a counter

24 over here, so that looks like it's right.

25      MR. KIND:  Okay.  Mary Kate, did you have

Page 125

```
 1    anything to add on the record?
 2              MS. KAMKA:  I do not.
 3              MR. KIND:  All right.  Did you want to
 4    read and sign, John?
 5              MS. KAMKA:  Yes, please.
 6              MR. KIND:  And do you think, either you
 7    or Mary Kate, do you think altogether maybe two
 8    weeks after receiving the transcripts, should that
 9    be enough, do you think?
10              MS. KAMKA:  Yeah, I'll defer to John on
11    that if there's any reason he can't meet that
12    deadline, but fine with us.
13              THE WITNESS:  No, from my perspective two
14    weeks is fine.
15              MR. KIND:  Okay.  Well, then in that case
16    I have nothing further, so let's go off the
17    record, if you're good with that, Mary Kate.
18              MS. KAMKA:  I agree.
19              THE VIDEOGRAPHER:  The time will be 4:49
20    p.m., and this will conclude today's video
21    deposition of Mr. John Ulzheimer.
22              (Deposition concluded at 4:49 p.m.)
23              (Signature reserved)
24
25
```

Page 126

```
1          I declare under penalty of perjury

2     under the laws that the foregoing is

3     true and correct.

4

5          Executed on _____ , 20___,

6     at _____, _____.

7

8

9                    _____

10                       DEPONENT'S SIGNATURE

11

12

13    Sworn to and subscribed before me this ___ day of

14

15    _____, _____.

16

17    _____

18    NOTARY PUBLIC

19    My Commission Expires:_____

20

21

22

23

24

25
                                           Page 127
```

```
 1                      CERTIFICATE
     STATE OF GEORGIA:
 2   COUNTY OF FULTON:
             I hereby certify that the foregoing
 3   transcript was taken down, as stated in the caption,
 4   and the colloquies, questions and answers were
 5   reduced to typewriting under my direction; that the
 6   transcript is a true and correct record of the
 7   evidence given upon said proceeding.
 8             I further certify that I am not a relative
     or employee or attorney of any party, nor am I
 9   financially interested in the outcome of this
10   action.
             I have no relationship of interest in this
11   matter which would disqualify me from maintaining my
12   obligation of impartiality in compliance with the
13   Code of Professional Ethics.
14             I have no direct contract with any party
15   in this action and my compensation is based solely
16   on the terms of my subcontractor agreement.
17             Nothing in the arrangements made for this
18   proceeding impacts my absolute commitment to serve
19   all parties as an impartial officer of the court.
20             This the 22nd day of February 2018.
21
22
23
24
25      Valerie Almand, CRR, RPR, CRC, B-531
```

Page 128

Veritext Legal Solutions
866 299-5127